## PEOPLE v. WARD.
### SAME v. LYON.

(Supreme Court, Special Term, Erie County. March 29, 1912.)

1. INDICTMENT AND INFORMATION (§ 137*) — QUASHING OF INDICTMENT — GROUNDS—INSUFFICIENCY OF EVIDENCE.

An indictment is subject to dismissal on the ground that the evidence received by the grand jury is insufficient to support it.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 480–487; Dec. Dig. § 137.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. INDICTMENT AND INFORMATION (§ 137*)—MANSLAUGHTER—EVIDENCE—SUF-
FICIENCY.

Evidence adduced before a grand jury *held* insufficient to sustain an indictment for manslaughter. .

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 480–487; Dec. Dig. § 137.*]

Indictments against Francis G. Ward and Henry Lyon for manslaughter. On motion to quash the indictments. Motions sustained.

Wesley C. Dudley, Dist. Atty. (Adelbert Moot, of counsel), for the People.

Louis E. Desbecker and Simon Fleischmann, for defendants.

POOLEY, J. The defendants are indicted separately for manslaughter, second degree. The indictments are identical, excepting the name of the defendant, and the name of the person killed; and are the result of the investigation of a grand jury into the collapse of the building designed for housing the engines of the new Pumping Station, a part of the water supply system of the city of Buffalo. There are eight indictments against each defendant, eight men having lost their lives in the fall of the building, and a separate indictment in each case. Stripped of legal phraseology, the charge is that the defendant had the supervision and approval of the plans and specifications of the foundation walls and superstructure, and of filling in about the foundations; that it was his duty to carefully supervise, approve, and examine, and cause to be carefully supervised, approved, and examined, the plans and specifications, to carefully place and cause to be placed proper filling in a proper manner, to carefully examine and cause to be carefully examined the foundation walls, to see and cause to be seen that they were safe and sufficient to convey and contain the superstructure, to test and cause to be tested the sufficiency of said walls, and to use and exercise every care and precaution in his power to render the building safe and secure during construction and upon completion thereof; that the defendant well knowing the premises, but wholly unmindful and neglectful of his duty, did feloniously and willfully neglect and omit to carefully perform the several duties above enumerated, and in consequence of the aforesaid culpable negligence, acts, and omissions, the building fell June 30, 1911, causing the death of the person named.

[1] The defendants now move to quash or dismiss all these indictments on the ground that the evidence received by the grand jury is insufficient to support them. This application is proper as a constitutional right (People v. Sexton, 187 N. Y. 495, 80 N. E. 396, 116 Am. St. Rep. 621), and "if the indictment was found without sufficient legal evidence to sustain it, it is not an indictment in contemplation of law, and cannot stand" (People v. Molineux, 27 Misc. Rep. 63, 57 N. Y. Supp. 939).

[2] An examination of the minutes of the grand jury was allowed as a basis for this application, disclosing the testimony of 46 witnesses, including not only the fellow workmen of those who lost their lives,

but several experts of high standing, the architect, contractors, and subcontractors upon the work, and various city officials, including both defendants who voluntarily appeared and testified before the grand jury.

The district attorney is to be highly commended, not only for the thoroughness of his work, but for the very clear and comprehensive presentation of a vast array of facts and figures, with the manifest purpose of showing, as far as possible, every detail, fairly and fully.

I have carefully read and considered this record from beginning to end, realizing that the awful calamity which cost the lives of eight young men, citizens of Buffalo, calls for the fullest investigation, and the placing of the responsibility for it, if possible. Strictly speaking, we are concerned only with the question whether or not these defendants, or either of them, should be placed upon trial under these indictments.

The defendant Francis G. Ward is, and for several years has been, Commissioner of Public Works, an elective officer, of the city of Buffalo, and as such had and has "charge and control" of the various departments, viz.: The public waterworks; public sewers; locating, grading, and opening streets; lighting the streets; constructing and maintaining bridges, canals, etc.; constructing public buildings, including, school, fire, police, and water department buildings; and other duties not important here. But for certain peculiar circumstances, the erection of the building in question would have come directly under the jurisdiction of the department of public works. It was determined, however, to locate this new plant upon park lands, and it became necessary to procure legislation permitting the use of park lands for this purpose. The act of the Legislature conferring this permission contained the proviso that the use of the park land would be permitted "upon such terms, conditions, restrictions and regulations as said board of park commissioners may prescribe." They never in form prescribed any, but they undertook to appoint. Mr. Wallace as the architect for the waterworks buildings, and later as superintendent of construction of them. Question arose later as to the regularity of his appointment, but this was eliminated by the ratification of the appointment by the common council of the city. The city had a bureau of buildings, with architect and full equipment for the ordinary requirements, but this was extraordinary and called for special treatment, and even if the park department had not intervened, the city had the power to employ outside assistance, if the common council so decided.

Mr. Wallace, therefore, being in charge as architect, prepared plans for the foundations, and continued from that time on, as the architect and superintendent of construction of said building. But it is urged that this work still belonged in the department of public works, and was under the "charge and control" of defendant Ward as Commissioner. Let us assume that this work had been undertaken by the department of public works in regular routine, without any aid from outside sources. The first step would be to refer the matter to the bureau of buildings for the preparations of plans and specifications by

its architect, and, if engineering problems arose, they would be solved by the structural engineer of this bureau. The heads of the various bureaus of the department are appointed by the Commissioner, the defendant Ward. There is not a suggestion that any of these appointees of the defendant were incompetent. The work would have proceeded in due course, and in the event of accident or failure in any part of the building, it could hardly be said that the Commissioner was personally answerable. The reason for this is obvious. The multifarious duties of the department must of necessity be delegated to others, and while the chief is bound to exercise great care in the choice of his subordinates, having done so, he is relieved of responsibility in the working out of the duties thus delegated. He still has the "charge and control," and may discharge subordinates for delinquency or other proper cause, and, as occasion may require, he may advise as to details, but under ordinary and normal conditions he could not be expected to give the matter personal attention. To demonstrate still further, apply the converse of the proposition by assuming that the head of the department is personally charged with responsibility. In that event he must possess technical knowledge in all the mechanical arts and sciences; he must be architect, engineer, and builder. Is it his duty to inspect the construction of the concrete foundations? If so, he must know the ingredients, their proportions, and mixture at all times. Is he responsible for the construction of the roof? If so, he must know the tensile strength of every member, the strength of the material, the method of its fabrication, and the placing of it in position. These illustrations might be indefinitely extended; but they will suffice to demonstrate the proposition that although the head of the department has charge and control, still he must, of necessity, delegate to others, chosen by him in the exercise of due care, the performance of the details of such charge and control.

We might be content to end the discussion here, but the gravity of the situation calls for the discussion of certain prominent features. It is apparent that the east foundation wall was found to have been deflected westward eight or more inches before the commencement of the work on the superstructure. This involved the design of it, its construction, and the filling in of the soil adjacent to it. As a foundation wall, it seems to have been of sufficient strength to sustain the load of the superstructure. As a retaining wall, it is criticised as being too light. It is conceded by all the witnesses testifying on this point that the concrete of which it is composed is of proper quality, but that the wall itself should have been of greater thickness to resist the lateral pressure of the fill on the outside. The deflection having been ascertained, the engineering department was called in, and under the direction of Mr. Field, an engineer of proven ability and years of experience, buttresses were constructed on the inside of the wall to overcome the resistance from the outside. The construction of these buttresses has been criticised because they were not built from the rock foundation; but it appears conclusively that, since their construction, the wall has not moved perceptibly and the deflection has ceased. In fact, the wall is the only part remaining in-

tact, substantially as it was when the building of the superstructure was commenced. But assuming that this wall was defective either in design or otherwise, its design and construction were legally delegated to Mr. Wallace, an architect of high standing and experience in his profession. When engineering difficulties arose, the city's expert engineer was called in, and the solution of them rightfully intrusted to him.

Another feature calling for discussion is the roof, which was composed of steel trusses spanning from east to west wall, and connected longitudinally north and south, and upon which the covering of concrete and tile was superimposed. Assuming that the general plan of the roof was proper, differences arose as to the interpretation of the plans and specifications. The original plans for the building in question provided for a skylight. The plans were modified to the extent of substituting a lantern construction at the peak of the roof in place of the skylight. Under the original plan, peak perlins were specified extending from truss to truss at the apex of the triangle or peak of the roof, the entire length of the building. The lantern being substituted, these peak perlins were omitted, possibly on the theory that the lantern, which was also steel construction, took place and answered the purpose of the peak perlins. The absence of these perlins is given by some of the witnesses as the cause or one of the causes of the failure of the roof. Again, it is shown that the lateral braces were omitted between the trusses. These were shown in the detail drawings, and were intended to prevent the swaying of the trusses, because a truss in and of itself sufficient to sustain vertical pressure might fail unless supported laterally. The roof contractor either misinterpreted the detail drawings, or possibly may have intended placing these braces later, as his work was not completed nor inspected by the superintendent of construction with a view to final acceptance.

Another criticism is that the trusses were not of sufficient strength, and that this was manifest by a bending of some of the members in the process of raising and placing the trusses in position.

Other features might be mentioned; but enough has been stated for the purpose of their recital here, which is to demonstrate the rule of responsibility for the failure of the building.

From all the evidence, I am of the opinion that, lamentable as this accident was, it cannot be said that criminal liability can properly be charged to any one. Skilled experts do not agree as to the cause of the collapse, several distinct causes of failure are claimed, and still no one undertakes to show conclusively the vital cause.

Mr. Lyon has nothing to do with the erection of this building. He was deputy water commissioner, and as such had control, under Commissioner Ward, of all the work of the water department. This included the maintenance of the intakes, the pumps, the laying and maintaining of the water mains and laterals throughout the city, involving a vast amount of detail. It is true that he was frequently about the building in question and gave suggestions in the progress of the work, but in no sense did he have or assume any responsibility for any part of it.

The conclusions reached are amply sustained by the best authority. Cochran v. Sess, 168 N. Y. 372, 61 N. E. 639.

This was a civil action for damages by an employé against his employer, a building contractor, for injuries sustained through the collapse of a wall through the alleged defect in the foundation. Judge O'Brien, writing the opinion in which the entire court concurred, says:

"The case, in its general aspect, is undoubtedly a hard one and stimulates the mind to search for some principle of redress for the loss and suffering of the plaintiff resulting from the death of his son. As the learned trial court said, the young man lost his life without any fault of his own, but through the fault of some one else, and he expressed the general and popular feeling very accurately when he said that some one ought to answer for the young man's life. But it is manifest that the defendants cannot be held liable for the result of the accident, unless some clear and definite legal principle can be found to justify such a conclusion. It would be palpably unjust to subject the defendants to damages upon some vague and indefinite theory of responsibility that the jury might evolve from their own sense of justice. If the defendants are liable at all, their liability must rest upon some definite rule of law."

This rule in a civil case applies with greatly added force in a criminal prosecution.

The Criminal Code provides (section 258) that the evidence before the grand jury, taken all together, in order to warrant an indictment, must be such as, if unexplained or uncontradicted, would warrant a conviction by the trial jury. If this evidence were before a trial jury, it would be the duty of the court to direct an acquittal.

The motion to quash or dismiss the indictments herein mentioned is granted.