[No. 2788. April 12, 1923. Rehearing Denied Sept. 13, 1923.]

## STATE v. CHANCE

### SYLLABUS BY THE COURT

1. District courts are without power to review the evidence submitted to a grand jury upon which an indictment was returned, to determine its sufficiency or insufficiency, existence or nonexistence, legality or illegality, as the finding of such grand jury with regard to such questions is conclusive.

2. A verdict of a jury which is supported by substantial evidence will not be disturbed on appeal.

Botts, J., dissenting.

Appeal from District Court, Lea County; Ryan, Judge.

G. O. Chance was convicted of embezzlement, and he appeals. Affirmed.

J. C. Gilbert, of Roswell, and E. de P. Bujac, of Carlsbad, for appellant.

H. S. Bowman, Atty. Gen., and A. M. Edwards, Asst. Atty. Gen., for the state.

### OPINION OF THE COURT

BRATTON, J. Appellant was convicted of embezzlement of certain personal property which had been placed in his care, custody, and control, the value of which was fixed by the jury at $45.

A plea in abatement to the indictment was interposed, in which appellant set forth and pleaded with considerable detail that the only evidence submitted to the grand jury in its consideration of the charge contained in such indictment was a former indictment returned by a former grand jury charging him with the same offense.; that such former indictment was submitted and exhibited to the grand jury, and upon that, and that alone, the indictment in question was returned; that netiher of the persons whose names were indorsed upon such indictment as witnesses for the state ever in fact appeared before said grand jury. To this plea a demurrer was interposed, upon the ground that such indictment, being regular upon its face, was conclusive, and that the court was without power to review the action of the grand jury for the purpose of determining the sufficiency or existence of the evidence upon which it was returned. This demurrer was sustained, the correctness of which is the first question involved.

It is provided by statute that grand juries shall consider only two kinds of evidence, first, that given by witnesses who are produced and sworn, or, second, legal documentary evidence. They can receive none but legal and the best evidence to the exclusion of hearsay and secondary evidence, and they should return

an indictment only when all the evidence, taken together, is such that in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury.

"In the investigation of a charge for the purpose of the indictment, the grand jury can receive no other evidence than: First. Such as given by witnesses, produced and sworn before them; or Second. By legal documentary evidence." Section 3128, Code 1915.

"The grand jury can receive none but legal evidence and the best evidence in degree, to the exclusion of hearsav or secondary evidence." Section 3129, Code 1915.

"The grand jury ought to find an indictment when all the evidence taken together is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury." Section 3131, Code 1915.

[1] There is a great contrariety of opinion among the courts upon this subject. It is generally conceded that if there is any legal evidence submitted to the grand jury, even though slight, the indictment will be sustained, notwithstanding there may have been illegal and incompetent evidence submitted and considered. Wharton on Cr. Law, section 508; 20 Cyc. 1346; 22 Cyc. 206. The exact question now before us, however. is whether or not the trial court had the power to inquire into the question of whether or not there was any competent evidence whatever submitted to the grand jury as a basis upon which it returned the indictment in question. To otherwise express the matter, it is whether or not the finding of the grand jury was conclusive upon the court. This is the question which has given rise to much divergence of opinion among the several courts which have had occasion to consider the subject. It has been held that courts have the power, and upon a proper plea asserting that no evidence was submitted to the grand jury, a hearing should be had, and if such fact is proven by competent evidence the plea should be sustained. State v. Logan, 1 Nev. 509; Bryant v. State, 79 Ala. 282; State v. Ivey, 100 N. C. 539, 5 S. E. 407; Royce v. Terr., 5 Okl. 61, 47 Pac. 1083; U. S. v. Farrington et al. (D. C.) 5 Fed. 343; U. S. v. Reed. 2 Blatch. 435, Fed. Cas. No. 16134; State v. Grady, 84

Mo. 224; State v. Faulkner, 185 Mo. 673, 84 S. W. 967; U. S. v. Rubin et al. (D. C.) 218 Fed. 245. Other courts have vigorously maintained that this cannot be done; that grand juries are judicial bodies with inquisitorial powers whose findings are conclusive, and the courts are without power to review their action to determine what evidence, if any, was submitted, whether it was competent or incompetent, legal or otherwise. State v. Dayton, 23 N. J. Law, 49, 53 Am. Dec. 270; Creek v. State, 24 Ind. 151; State v. Fowler, 52 Iowa, 103, 2 N. W. 983; State v. Roberts, 2 Boyce (Del.) 140, 78 Atl. 305; State v. Kelliher, 49 Or. 77, 88 Pac. 867; State v. Boyd 2 Hill (S. C.) 288, 27 Am. Dec. 376; Dockery v. State, 35 Tex. Cr. R. 487, 34 S. W. 281; Kingsbury v. State, 37 Tex. Cr. R. 259, 39 S. W. 365; Lee v. State. 66 Tex. Cr. R. 567, 148 S. W. 567, 40 L. R. A. (N. S.) 1132; State v. Woodrow et al., 58 W. Va. ——, 52 S. E. 545, 2 L. R. A. (N. S.) 862, 112 Am. St. Rep. 1001, 6 Ann. Cas. 180; Lee v. State, 66 Tex. Cr. R. 567, 148 S. W. 567, 40 L. R. A. (N. S.) 1132; Noll v. Dailey, Judge, et al., 72 W. Va. 520, 79 S. E. 668, 47 L. R. A. (N. S.) 1207; Smith & Cavin v. State, 61 Miss. 754. Other decisions discussing the question now under consideration may be found in the note appended to State v. Peterson, 28 L. R. A. 324; U. S. v. Cutler, 5 Utah, 608, 19 Pac. 145.

The cases hereinbefore cited have disposed of the question upon principles, without regard to statutory consideration. The state of New York has statutes identical with ours with regard to the kind and degree of evidence necessary to the return of an indictment of a grand jury and it has been there held that by virtue thereof grand juries are precluded from considering any but legal and the best evidence, and that if, in violation of such statutes, indictments are returned without the kind and degree specified, the court may review the subject and set them aside. People v. Metropolitan Traction Co. (N. Y. Gen. Sess.) 50 N. Y. Supp. 1116; People v. Molineux, 27 Misc. Rep. 60, 57 N. Y. Supp. 936; Id., 27 Misc. Rep. 79, 58 N. Y. Supp. 115; People v. Gresser (Sup.) 124 N. Y. Supp. 581; People v. Ward, 76 Misc. Rep. 323, 134 N. Y. Supp. 330;

People v. Walsh, 92 Misc. Rep. 573, 156 N. Y. Supp. 366; People v. Sexton, 187 N. Y. 495, 80 N. E. 396, 116 Am. St. Rep. 621.

The state of California has statutes upon this subject identical with ours, and that state has held contrary to the state of New York. It has been there held that such statutes are merely ''for the guidance of the grand jury,'' and that the courts have no power to review the evidence submitted before the grand jury for the purpose of determining whether or not the statutes have been complied with. In re Kennedy, 144 Cal. 634, 78 Pac. 34, 67 L. R. A. 406, 103 Am. St. Rep. 117, 1 Ann. Cas. 840; Brobeck v. Superior Court, 152 Cal. 289, 92 Pac. 646; Borello v. Superior Court, 8 Cal. App. 215, 96 Pac. 404; People v. Hatch, 13 Cal. App. 521, 109 Pac. 1097; People v. Panagoit, 25 Cal. App. 158, 143 Pac. 70; People v. Fealy, 33 Cal. App. 605, 165 Pac. 1034. In People v. Panagoit, supra, it is said:

"Defendant further contends that the testimony taken before a grand jury was insufficient to support an indictment for the reason that in no part of the evidence was it shown, or testified to, that the presentation of the false claim to the insurance company, or to any other person, was made in the city and county of San Francisco, and, for that reason there is nothing to confer jurisdiction upon the superior court of Alameda county. This contention cannot be maintained. There is no provision in our law for thus reviewing the action of a grand jury in finding an indictment. The validity of an indictment cannot be attacked upon the mere ground of insufficiency of evidence to support it. Courts cannot, in the absence of a statute permitting it, inquire into the sufficiency of the evidence upon which the grand jury acted, in order to invalidate an indictment returned by them."

And again in People v. Fealy, supra, this language is used:

"But conceding, for the purpose only of the decision of the point now before us, that the testimony so heard was entirely incompetent and in any event entirely insufficient to justify the indictment, yet, under the law, an appellate court cannot review that question to any purpose. It is true that section 919 of the Penal Code provides that the grand jury can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence. It is also true that section of 921 of said Code declares that 'the

State v. Chance. 29 N. M. 34.

grand jury ought to find an indictment when all the evidence
before them, taken together, if unexplained, or uncontra-
dicted, would, in their judgment, warrant a conviction, which,
no doubt, also means that, unless the evidence is such as is
thus described, an indictment ought not to be returned,
although it has been held that as far as said section was in-
tended to go, was to operate only as a matter of advice to the
jury.' State v. Boyd, 2 Hill (S. C.) 288, 27 Am. Dec. 376: In
re Kennedy, 144 Cal. 634, 78 Pac. 34, 67 L. R. A. 406, 103 Am.
St. Rep. 117, 1 Ann. Cas. 840. It has, however, repeatedly
·been held in this state that there is no method provided for
revising the action of a grand jury on the ground that there
was no sufficient evidence to support it."

It is obvious that there is a mass of authority upon
this subject, that the courts are hopelessly in conflict,
and it remains for us to adopt the rule which we think
to be most sound and which will best subserve the
rights of parties litigant. The proceedings of the
grand jury throughout legal history have always been
secret. It is a judicial tribunal with inquisitorial
powers, and, unless there is some clear statutory au-
thority to do so, we think the courts are without power
to review its action to determine whether or not it had
sufficient or insufficient, legal or illegal, competent or
incompetent evidence upon which to return an indict-
ment. To hold otherwise would permit every person
who is indicted to present a plea in abatement charging
that no evidence had been submitted to or received by
the grand jury upon which such indictment could have
been, or was in fact, returned, and then, upon a hear-
ing had upon such plea, introduce the witnesses who
appeared before such grand jury and ascertain the
facts which were submitted to the grand jury and to
which they would likely testify upon the trial, thereby
ascertaining the evidence available to the state to which
the accused would be called upon to respond, thus in-
jecting into our judicial system a new and highly ob-
jectionable procedure. We think the statutes referred
to. governing the kind, character, and degree of evi-
dence which should be produced before a grand jury in
order to warrant the returning of an indictment, are
directory and are for the guidance of the grand jury.
To be sure, they should be followed, and members of

the grand jury, as well as district attorneys, should endeavor to comply with their provisions, but we think the findings of such grand jury, when made by and through an indictment, duly returned into court, and regular upon its face, are, with respect to the kind and degree of evidence upon which it was returned, conclusive, and that the courts are without power or jurisdiction to inquire into the subject and review the testimony submitted to the grand jury to determine whether or not the required kind or degree of evidence was submitted. It follows that the trial court was correct in sustaining the demurrer.

[2] The next and last question urged upon us is that the verdict is not supported by substantial evidence. We have carefully examined the record and are unable to agree with this contention. The issues of fact were contested, but their determination was for the jury. There is substantial evidence in the record to support the verdict, and under the uniform holding of this court it will not be set aside. State v. Whitener, 25. N. M. 20, 175 Pac. 807; State v. Jaramillo, 25 N. M. 228, 180 Pac. 286; State v. Wilson, 25 N. M. 439, 184 Pac. 531.

The judgment will therefore be affirmed; and it is so ordered.

HOLLOMAN, District Judge, concurs.

BOTTS, J. (dissenting). The majority say that the exact question before us "is whether or not the trial court had the power to inquire into the question of whether or not there was any competent evidence whatever submitted to the grand jury as a basis upon which it returned the indictment." This is my first point of disagreement. As will be seen from the statement of the case made by the majority, the prosecution, by demurring to the plea in abatement, admits that there was no such competent evidence before the grand jury. The exact question, therefore, is whether or not the trial court had the power to quash, or otherwise annul,

State v. Chance. 29 N. M. 34.

the indictment on this ground, and, if so, whether that power should have been exercised in favor of the accused. In my opinion, this question requires an affirmative answer in its entirety. We are not here dealing with any of the many questions which might have confronted the accused, relative to his means of proving the facts necessary to sustain his plea in abatement, the effects of the grand juror's oath, and other kindred questions. if an issue of fact had been made on this plea instead of a pure issue of law.

But, taking the question as they have stated it, I am still unable to agree with the conclusion reached by my associates, and, owing to the great respect I have for their learning and ability, as well as the importance of the question under consideration, I feel that I owe it to them, as well as to the bar, to state the grounds of my dissent. In doing so I shall necessarily state my position upon the real question before us as I see it.

If, as the opinion of the majority necessarily holds, the grand jury is a judicial tribunal absolutely independent of control or supervision by the court with which it sits, cloaked in absolute secrecy for all purposes, and thereby, both as to members and witnesses, wholly irresponsible, it contradicts every theory of the English and American judicial system of which we have been so proud.

If, as the opinion of the majority would seem to indicate, the law has set up a lawless tribunal; an accusing body which can obey or disobey the law as it pleases; before which one's enemies can appear and, without responsibility or fear of consequence, bring to bear all the malice and improper influence and unlawful means at their disposal, to the end that one shall suffer the humiliation of an indictment, then I say the grand jury has become a sword for the destruction of our liberties instead of a shield for their protection.

I cannot bring myself to believe that the people of this state, in preserving the grand jury system as a constitutional right, ever intended that their courts, to

whom the citizen always looks for the protection of his fundamental rights, in the organization of their grand juries should thereby create a Frankenstein, ungoverned and ungovernable.

The Constitution of this state (article 2, §14) has guaranteed to the citizen that he shall not "be held to answer for a capital, felonious or infamous crime unless on a presentment or indictment of a grand jury." Inasmuch as the Constitution does not undertake to define a grand jury, nor to prescribe its powers or duties, I think it will be accepted without question that the people intended that all such matters should be supplied by the common law except where the common law had been changed by statute at the time of the adoption of the Constitution. State v. Hartley, 22 Nev. 342, 40 Pac. 372, 28 L. R. A. 33; State v. Barker, 107 N. C. 913, 12 S. E. 115, 10 L. R. A. 50; 27 L. R. A. 846, note. It, therefore, becomes important to determine what the common law is.

Whether the grand jury was of Saxon origin (Crabb's History of English Law, 32; Hale's Common Law, 149), or was a Norman institution, brought to England by the conqueror, as claimed by some, is a question for the law historian rather than an appellate court. Be that as it may, this inquisitorial and accusing body was well known to Bracton, Chief Justice of England, who wrote in the latter half of the thirteenth century, during the reign of Henry III (translation of Bracton, book 3. tr. 2, c. 1, §§ 1 and 2, as appears in Readings on the History and System of the Common Law, by Pound, 115 et seq.; 2 Hale's Pleas of the Crown, 1 Am. Ed. 164a, note), although the members were then drawn from the hundred instead of from the whole county, as in the reign of Edward III and thereafter. The Grand Jury, Edwards, 2.

In connection with our particular subject of inquiry, it is interesting to note what Bracton has to say concerning the duty of the judge with reference to his supervision and control of the inquest. His language

State v. Chance, 29 N. M. 34.

in this connection ·is set out in the original Latin at page 164b of 2 Hale's Pleas of the Crown. I am indebted to A. B. Renehan, Esq., of the Santa Fe bar, for assistance in the following translation:

"The judge, then, if he be wise (discerning), when the truth should be inquired into, on account of report and suspicion through the country, whether one indicted for a crime charged against him be guilty or not, should, in the first place (above all or by all means), if perchance he doubts and the evidence is questionable, inquire upon what thing or things those twelve men declare those things which in their declaration (indictment) they brought against the indicted person; and these things being heard, in this respect, he should· be able to weigh (determine) by their ready answering (readiness in answering) if there be trick or fraud (injustice or iniquity) underneath. Perhaps one or the major part of the jurors will say that those things which they brought out against that one (the accused) in their declaration (indictment) were told by one from among his associates (conjuratoribus—accomplices—conspirators), who, when questioned, perhaps will say that he stated those things (on a statement) from one so and so, and thus the questioning and answering could go on down from person to person unto some low and base and so so to whom faith (credit) will not in any degree be attached (attributed).

"And thus let the judge inquire (investigate) in his own way, so that his own honor and title to praise may be increased; and at last it is said Jesus is crucified and Barabbas is set free; and, indeed, in this way, through questioning (inquiries) if it is (not) done diligently and carefully, many inconsistencies will be found."

Coming down to a period nearer the date of the separation from the Mother Country, we find more complete information as to the powers, duties, and workings of the grand jury, and of the duties and powers of the court with reference thereto, from the full report of the proceedings in the Earl of Shaftesbury Case, heard in 1681, and reported in 8 Howell's State Trials, beginning at page 759. From that report it is seen that the oath administered to the grand jury at that time was practically the same as that now in use. Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652; section 3116, Code 1915. The Lord Chief Justice fully instructed· the jury before they began their work, among other things, that whether the matter contained in the indictments that should be brought before them,

and which they should have in evidence, be matter of reason, and—

"If you doubt of it, then you must advise with us that are commissionated of his majesty, to hear and determine these crimes; and in matters of law we shall direct you" (page 769).

And again at page 770:

"I must tell you, that that which is referred to you, is to consider, whether, upon what evidence you shall have given unto you, there be any reason or ground for the king to call these persons to an account; * * * that as it is a crime for to condemn innocent persons, so it is a crime as great to acquit the guilty; and that God that requires one of them, requires both; so that you must be as strict in the one, as you would be in the other. And let me tell you, if any of you shall be refractory, and will not find any bill where there is a probable ground for an accusation, you do therein undertake to intercept justice; and you thereby make yourselves criminals and guilty, and the fault will lie at your door; * * * and you are engaged, as Englishmen, to consider that crimes of this nature ought not to go unpunished; then you have an oath of God upon you, you are here sworn to do according to what the evidence is. * * * Therefore, gentlemen, I must require you to consider such evidence as shall be given you, and to be impartial, according to what you shall hear from the witnesses, if you have ground, upon what evidence you shall have given you, to believe that there is any reason or cause for the king to call the persons named in such indictments, as shall be tendered to you, to answer for what is objected against them therein, you are to find those bills; that is all I say to you; only pray God to direct you in your inquiry, that justice may take place."

Following the instructions a bill of high treason was offered against the Earl of Shaftesbury, and the king's counsel moved that the evidence might be heard in court, whereupon the Lord Chief Justice instructed the grand jury that they would proceed to hear the evidence in open court. The foreman of the grand jury stated that he was of the opinion that the jury ought to examine the witnesses in private, and that it had been the constant practice of their ancestors and predecessors to do it, and insisted upon their right so to do. The Lord Chief Justice then told the grand jury that it might be very probable that some late usage had brought them into this error, and that it was not their

right, but that the reason for the late custom for grand juries to examine witnesses privately; and out of court, was to comply with the conveniences of the court, in that, generally, the court had much business, and if, at such times, the courts should examine all businesses publicly in the court ''it would make the business of these commissions of a wonderful great length and cumbrance''; and that:

"Therefore, the judges, for the conveniency of the matter, have allowed that witnesses should go to the jury, and they to examine them; not that there is any matter of right in it; for, without question, originally all evidences were given in court. The jury are officers and ministers of the court. by which they inquire, and evidence sure was all given in court formerly; and the witnesses still are always sworn in court, and never otherwise. And, gentlemen. I must tell you, it is for your advanatge, as well as for the king's that it may be sure that you comply with your evidence, that you do nothing clandestinely; therefore it is for your advantage that this is done, and the king likewise desires it. * * * Therefore, gentlemen, there can be no kind of reason why this evidence should not be given in court. What you say concerning keeping your counsels, that is quite of another nature, that is, your debates, and those things, there you shall be in private, for to consider of what you hear publicly. But certainly it is the best way, both for the king and for you, that there should, in a case of this nature, be an open and plain examination of the witnesses, that all the world may see what they say."

Then the foreman of the grand jury advised the court that the jury apprehended that their oath of secrecy prevented them from engaging in a public hearing and a juror by the name of Papillon insisted that it had been the common usage and practice, and that it was the law of England, that the hearings should be in private, whereupon the Lord Chief Justice spoke further, as follows:

"Look ye, Mr. Papillon, it is reasonable that we should give you our advice in this case: I must tell you, if you had considered of what I had said before, I thought I had obviated these objections: First, as to what you do say that you are bound to conceal your counsels, and the king's secrets, that is very true; as to your counsels, that is, your debates, you are bound to conceal them. As to the king's secrets, so long as he will have them kept secret, you are bound to keep them

so too; but it doth not deprive the king of the benefit of having it public, if he have a desire for it; you don't break your oath, if the king will make it public; you do not make it public; 'tis the king does it; then as to that you do say, that you apprehend the common usage of the kingdom to be a law; that is true, Mr. Papillon, in some sense; a constant and uninterrupted usage goes for a law among us: but I thought I had told you before, that both of ancient and latter times there have been examinations of the witnesses in court, in cases of this nature; and we are not without precedents of it every year, every term, continually from time to time, evidence is heard in court by the grand jury; it is as usual a thing with us, as anything, if it be desired, nothing more frequent or more common; I never heard it denied or stood upon by any grand jury, in my life, till of late here; you may be instructed with a thousand precedents, for I am sure it is a common and ordinary case, upon such occasions, if desired, to hear the evidence in court."

After some further colloquy between the court and jury, the indictment was read and numerous witnesses were called, the examination of whom was participated in by court, counsel, and jurors. During the course of the examination the court frequently directed the jury as to their duties and the class of evidence they should hear, as for instance, at page 803:

"Mr. Papillon. If we are not left to consider the credibility of the witnesses, we cannot satisfy our consciences.

"L. C. J. Look ye, gentlemen, you are to go according to the evidence of the witnesses; you are to consider of the case according to the things alleged and proved, unless you know anything yourselves: But if any of you know anything of your own knowledge, that you ought to take into consideration, no doubt of it.

"Jury. Very well, my lord.

"L. C. J. The grand jury are to hear nothing, but the evidence against the prisoner; therefore, for you to enter into proofs or expect any here, concerning the credit of the witnesess, it is impossible for you to do justice at that rate."

Following the hearing of the evidence in open court the jury retired to consider the evidence, and thereupon returned the bill ignoramous (no bill).

Two years later it appears from a note to the above case, at page 825, 8 Howell's State Trials, that at the Lent Assizes at the town of Derby, there was a bill pre-

State v. Chance. 29 N. M. 34.

ferred against one for being a priest, into the grand
jury, but the bill was returned ignoramus. The judge,
knowing the evidence to be plain, sent them out to con-
sider of it again, which they did, and again brought in
ignoramus. Upon this the judge told them, for the
satisfaction of the country he would examine the wit-
nesses in open court, which being done, the same grand
jury, upon the same evidence, found a true bill.

As throwing further light upon the powers of the
grand jury and the basis of their findings, the instruc-
tions of the court to the grand jury in the trial of
Joseph Dawson et al., in 1696, the proceedings being
reported in 13 Howell's State Trials, beginning at page
451, may be of assistance. With reference to the basis
of their findings, the court, among other things, told
the grand jury:

"And upon this occasion, seeing many who are upon that
service are present, it seems fit that they should also know
that they have no power to do more or less than what is
agreeable to the evidence; they are not to interpose in points
of law, or to be swayed by any consideration whatsoever, but
what shall arise from the proofs judicially made; they are
indeed judges of the fact, but they are not arbitrary; they are
as much restrained by the dictates of conscience, informed
and convinced by reasonable proofs, as the judges on the
bench are by the rules of law."

That the right and duty of the court in superintend-
ing and controlling the actions of the grand jury were
carried forward in the common law to a time at least
subsequent to the date of the separation is apparent
from a passage in Chitty's Criminal Law, quoting from
volume 1 of the edition published in 1847, at pages 312
and 313, from which it would appear also that the
option of publicly hearing the evidence had shifted
from the king's prosecutor to the court:

"When the charge (charge of the court to the grand jury)
is concluded, the recognizances to prosecute and give evi-
dence are then called, so that bills may be drawn and pre-
pared; which being ready, the parties bound to give evidence
upon them, are sworn, and sent to the grand jury to give
their evidence to them, in the room to which they have re-

State v. Chance. 29 N. M. 34.

tired; though it is said, that if the matter be weighty or diffi-
cult, or if it appear that the prosecution is too indulgently, or
too vindictively conducted, the evidence may be heard in
court, so that the jury may be the better assisted in the per-
formance of their duty."

The. same language is used in Tomlin's Law Dic-
tionary at page 39 of volume 2 of the edition published
in 1836, title "Grand Jury." At page 193 of volume
3 of the edition of Jacob's Law Dictionary, published
in 1811, title "Grand Jury," it is said:

"If the bill be against A for murder, and the grand jury,
on the evidence before them, be satisfied it was se defendendo,
etc., and so returned it specially, the court may remand them
to consider better thereof, or hear the evidence at the bar,
and accordingly direct the grand jury."

For another instance of the common law courts exer-
cising this control and supervision, prior to the separa-
tion, see Robert Scarlet's Case, 12 Coke, 98, 77 English
Reprint, 1373:

"Note, that a sessions of peace held lately at Woolbridge in
the county of Suffolk, the sheriff returned a grand inquest,
of which one Robert Scarlet in the county of Suffolk had
requested to be one, but the sheriff knowing the malice of the
man refused to return him; but notwithstanding by confed-
eracy with the clerk who read the panel, he was sworn of
the grand inquest, and was not returned by the sheriff; and
being amongst them of the grand inquest, and as one of
them, of his malice, and upon his own knowledge, as he
pretended (to whom the rest gave credit) indicted seventeen
honest men, upon divers penal laws: and some of the justices
looking over the bills found by the grand inquest, and per-
ceiving so many honest men to be indicted, as they did think,
maliciously, demanded of them and of the inquest, what evi-
dence they had to find the said bills, and they answered by
the testimony and cognizance of one of themselves, scil. of
Robert Scarlet: and upon examination it did appear, that the
said Robert Scarlet was not returned, but that he, by confed-
eracy betwixt him and the clerk, procured himself to be sworn
of the said grand inquest, with intent to indict his neighbors
maliciously, for which offence he was indicted at Summer
Assizes, anno 10 Jacobi, held at Bury, upon the statute 11
Hen. 4, cap. 9, by which it is provided, that no indictment
shall be found by any persons named to the justices, without
due return of the sheriff, but by inquest of lawful liege-
people of the King, in such manner as was used in the time
of his noble progenitors, returned by the sheriff, etc., with-
out any nominations, etc. And if any indictment be made

State v. Chance. 29 N. M. 34.

hereafter in any point contrary, that the indictment shall be void, and forever be held null."

The case of Rex v. Bridgewater, etc., Co., 7 Barn. & C. 514, 1 Man. & Ry. 272, 6 L. J. M. C. O. S. 23, 108 English Reprint, 814, while decided after the separation (1827), illustrates the practice of. the English courts in dealing with an indictment regular on its face but not found in accordance with law, an indictment in form but not in substance. The defendant sought to quash the indictment upon the ground that there was no evidence considered by the grand jury, and that the subject-matter of the indictment had never been before the jury. The crown resisted on a pure question of law, and the indictment was quashed.

This somewhat detailed review of the history of the grand jury has been attempted, not in any spirit of ancestor worship, nor from any lack of appreciation of the fact that the law, to retain its respect and usefulness, must be a living thing, keeping pace with the ideas of modern progress, but in an effort to interpret the language of our Constitution in the light of its traditional and historical use. Time does not necessarily make a rule of human conduct infallible, nor does it necessarily render a law out of date. The decalogue is still looked upon as embodying some pretty salutary rules. Our forefathers, when they brought the grand jury institution with them to this country, looked upon it is as valuable heritage and, by means of the federal Constitution, guaranteed its preservation.. Practically all the states of the Union have likewise guaranteed to their people its continuance as the sole method of accusation, except in crimes of minor importance. What is the nature of the institution which the people have thus sought to preserve? It has been my effort to answer this question in so far as the right, power, and duty of the court to superintend and control the action of that body and the kind of evidence to be considered are concerned, and, in the language of Justice Holmes (N. Y. Trust Co. v. Eisner, 256 U. S. 345, 349, 41 Sup. Ct. 506, 507 [65 L. Ed. 963, 16 A. L. R. 660]):

"Upon this point a page of history is worth a volume of logic."

I am further convinced that, at the time of the separation, the character of evidence required as the basis of an indictment was practically, if not identically, the same as that required by our statutes quoted in the majority opinion, although I do not find the rule stated in the language of our statute. The grand jury were "bound to take the best legal proof of which the case admits, and it must be given on oath" (1 Chitty's Cr. Law 318), and were not permitted "to be swayed by any consideration whatsoever, but what shall arise from the proofs judicially made" (13 How. St. Tr. 455), except that the common-law rule went further than our statute, and permitted an indictment to be found on the personal knowledge of the grand jurors (8 How. St. Tr. 803; Id. 838; Regina v. Russell. 1 Carr. & M. 247, 41 Eng. C. L. R. 139); but by "personal knowledge" is not meant information acquired by rumors and reports, but from the evidence before them, or from the grand jurors' personal observation. Mr. Justice Field, Charge To Grand Jury, 2 Sawy. 667, 30 Fed. Cas. 992, No. 18,255; Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652; Judge Sanborn, in dissenting opinion, McKinney v. U. S., 199 Fed. 25-32, 117 C. C. A. 403. In other words, at common law, a grand juror was not an incompetent witness by reason of his service on, and participation in, the inquisition.

And, so it is my opinion, that the grand jury guaranteed to the people of New Mexico is an accusing body, sitting and acting, not independently, but as a part of the court of which the presiding judge is the head, free to make such accusations as to it may seem proper, so long, and only so long, as those accusations are made in accordance with the requirements of the law; and that, among these requirements, is one that the accusation must be bottomed on competent evidence. When this requirement is violated, the constitutional rights of the accused are violated, which the court has the power to. and should, rectify. A court has no juris-

diction, in the absence of waiver, to try one for a crime such as that now before us, except upon accusation by indictment, not an indictment in form merely, but an indictment found as the Constitution requires, an indictment found and presented in accordance with the long-established rules of law governing the organization, rights, powers, duties, and conduct of grand juries which were in force at the time our Constitution was adopted. So, the appellant in this case was put upon his trial in contravention of his constitutional guaranties and of the statutes enacted for his protection. This the court below should not have permitted, and this court should not now permit the conviction to stand.

With reference to the power of the court over indictments, in the case of U. S. v. Coolidge, 2 Gall. 364, 25 Fed. Cas. 622, No. 14,858, where the defendant sought to quash the indictment on the ground that a material witness for the government gave his evidence before the grand jury without first being sworn, Justice Story, the associate of, and collaborator with, the great Marshall, said:

"The grand jury is the great inquest between the government and the citizen. It is of the highest importance, that this institution be preserved in its purity, and that no citizen be tried, until he has been regularly accused by the proper tribunal. Every indictment is subject to the control of the court, and this indictment, having been found irregularly, and upon the mere statement of a witness without oath, which was not evidence, a cassetur must be entered."

When we examine the more recent decisions, as is well said by the majority, we find a contrariety of opinion, though I believe there are very few holding with the majority upon the particular question before us. Most of the cases cited are either those where there was some competent evidence heard by the grand jury, or where the accused was without, or was denied, the means of proving the unauthorized and unlawful acts of the grand jury. Some also have been decided upon the insufficiency of the showing made by the accused

as the basis for an investigation; while others seem to have come from courts with one eye on the bugbear of secrecy, and the other elsewhere than on the Constitution.   No good can come from a further analysis of these various opinions.   I merely cite a few additional cases from different jurisdictions where the courts have exercised their right and duty of control and supervision over the grand jury: Collier v. State, 104 Miss. 602, 61 South. 689, 45 L. R. A. (N. S.) 599; State v. Cole, 145 Mo. 672, 47 S. W. 895; U. S. v. Kilpatrick (D. C.) 16 Fed. 765; Commonwealth v. Green, 126 Pa. 531, 17 Atl. 878, 12 Am. St. Rep. 894; Low's Case, 4 Greenl. (Me.) 439, 16 Am. Dec. 271.   The matter has never been passed upon by this court, and it is now for us to declare the correct rule.   This, in my opinion, the majority have not done.

The California rule, which I understand the majority to be following, finds its latest expression in the case of People v. Collins (Cal. App.) just reported, 212 Pac. 701.   This case follows those cited by the majority. The rule is there declared to be that, since the Penal Code expressly sets forth the grounds upon which an indictment may be set aside, and, incompetent evidence as the basis of indictment not being one of the grounds enumerated, an indictment cannot be set aside on that ground or any other ground not so enumerated.   The majority state the same rule in different words:

"Unless there is some clear statutory authority to do so, we think the courts are without power to review its [the grand jury's] action to determine whether or not it had * * * competent or incompetent evidence upon which to return an indictment."

As I read this rule in the light of our Constitution, it means that a grand jury may deprive a citizen of a constitutional guaranty which the courts are powerless to protect, because the Legislature has not authorized the courts to act.   I do not believe that any legislative authority is necessary to enable the courts to set aside and nullify the unconstitutional act of any govern-

State v. Chance. 29 N. M. 34.

mental agency. The courts repeatedly hold for naught the acts of the Legislature itself which violate the Constitution. May the grand jury violate the Constitution while the Legislature may not? If the California rule is to be adopted in New Mexico, the grand jury will be above and more powerful than the court or the Constitution, a creature beyond the control of its creator. Again the story of the Frankenstein comes to mind.

While it is unnecessary for us to decide any question relating to the means at the command of the accused for establishing the truth of the allegations of his plea in abatement, or of the effect of the rule of secrecy, it is probably apparent, from what I have already said, that, if that question were here, so far as permitted by a previous decision of this court (U. S. v. Tallmadge, 14 N. M. 293, 91 Pac. 729, 20 Ann. Cas. 46), I should give careful consideration to the proposition that whenever the fundamental rights of a citizen are violated by the grand jury, and a sufficient showing thereof is made to the court, the veil of secrecy surrounding that body cannot withstand the strength of the Constitution; that the rule of public policy, requiring the proceedings of the grand jury to be kept secret, is one for the furtherance and promotion of justice, not for its obstruction or defeat, and when the reason for the rule ceases the rule itself ceases. Atwell v. U. S., 162 Fed. 97, 89 C. C. A. 97, 17 L. R. A. (N. S.) 1049, 15 Ann. Cas. 253 (C. C. A. 4th Cir.). Mr. Rice, 3 Crim. Proc. 409, as quoted by Judge Sanborn, says:

"The jealousy with which the early law guarded the secrets of the grand jury room has largely disappeared. The sacramental character of that august body is very imperfectly recognized at the present day. The theory that the proceedings before this body are beyond the scrutiny or condemnation of court or counsel is a foolish pretense that is very generally abandoned. Malice, corruption, and ignorance frequently combine to impress upon the proceedings of this body the tyrannical and oppressive functions of the Star Chamber and the Council of Ten. And to say or even intimate that, where corrupt practices exist, there is no method open for their proper disclosure, is simply to insist that our criminal law is crippled with a hideous deformity."

It may seem hypercritical for me to argue against the conclusion of the majority in a case where the defendant, while indicted wholly without evidence and contrary to law, was tried before a petit jury and found guilty on competent evidence; but this court is establishing a precedent for the future, and I cannot close my eyes to the fact that it is only those cases of this nature where there has been a conviction which find their way here, and that those citizens who may be unlawfully indicted through suspicion, rumor, malice, public clamor, personal influence, or worse means, and who may thereafter have been acquitted by a petit jury, possibly even by direction of the court, in the meantime will have been compelled to suffer the suspense, humiliation, and expense of a trial, the risk of perjury or error, and the disgrace of imprisonment or the burden of bail. An acquittal, finally, does not justify the unconstitutional burden of an indictment in form only, nor compensate the citizen for the deprivation of his fundamental rights.

Finally, in this dissent, I find myself in distinguished company. Judge Sanborn, the Senior Justice of the Eighth Circuit, whose opinions are looked upon with the greatest respect by the bar of this court, in the case of McKinney v. U. S., 199 Fed. 25, 117 C. C. A. 403, in a most forceful opinion, dissented from the holding of the majority of his court that, unless in extreme instances to prevent clear injustice, or an abuse of judicial process, a defendant against whom an indictment has been returned cannot require the court to review the evidence before the grand jury to determine its sufficiency or whether incompetent evidence was received. To quote the pertinent language of his dissent would be to copy the whole; a paraphrase or a condensation would be an attempt to improve the perfect. In language so much clearer and more forceful than any at my command, he has set forth my argument or at least one which should be read in further explanation of my position.

But I do not understand even the majority opinion

in that case to be contrary to my position here. Surely this is an "extreme instance," a case where it is admitted that the indictment upon which the appellant went to trial was returned without any competent evidence whatsoever before the grand jury, and not a case where the court is called upon to determine the sufficiency of some competent evidence. In sustaining the demurrer to appellant's plea in abatement, in my opinion, the court clearly committed error.