(No. 5862.   April 28, 1932.)

STATE, Respondent, v. ARTHUR LLOYD MILLER, Appellant.

[10 Pac. (2d) 955.]

J. T. Evans, for Appellant.

Fred J. Babcock, Attorney General, and Z. Reed Millar, Assistant Attorney General, for Respondent.

LEE, C. J.—Defendant and appellant, Arthur Miller, gambler by occupation, was convicted of grand larceny. In October, 1928, at Boulder, Colorado, he had married the prosecuting witness, Irene Miller. Due, possibly, to the peripatetic nature of the skipper's business and a suspected weakness for the fair sex, of which more later, the matrimonial barque encountered squalls, culminating in a decree of divorce granted the wife, after default, by the district court of Bonneville county September 19, 1931. The complaint charged defendant with about everything from seven-up to manslaughter, including neglect, failure to provide, infractions of the seventh commandment, kicks, curses and blows most grievous. Summons was served by publication.

According to uncontradicted evidence, eight days subsequent to the court's declaration of his spouse's independence, ex-husband Miller hove into Idaho Falls, where he proceeded to telephone his former mate, inquiring if in fact she had secured a divorce. She assured him that it was news to her, later joined him in his room at the hotel and "stayed there and talked," the pair finally walking downstairs together and across the street, where they temporarily separated, appellant wending cafewards to satisfy an inner longing. Having achieved that immediate objective, he returned to the grass-widow, visiting with her at the Clayton until about 2:30 A. M. He told her he was going to Salmon next day, she requesting him "to call her up from Salmon, and to write to her." To Salmon he went but nor called nor wrote. Came October 5th. Back in Idaho Falls, he "went over and talked to her," telling her that he purposed leaving for Sheridan next morning. The following conversation ensued:

"She begged me to stay there. And I told her no; and she says, 'No,' she says, 'you got that blonde over there in Sheridan.' I told her 'No, I ain't got nobody.' She says,

'Well, why can't you stay with me?' I says, 'Because you won't do nothing but fight with me.' So then she says— she asked me if I would write to her, and I told her yes. And she wanted me to stay all night; and I told her, 'No,' I said, 'I am going to leave, and want to get up early in the morning.' ''

Appellant then took himself off to bed.

But the next day found him again at the Clayton. Both "agreed together that there should be a purchase of a car." So, together, the lately divorced partners fared forth: they investigated several, each participating in the incident conversation. On the 9th, a deal was made for a Chevrolet, the purchaser named in the contract being Irene Miller. Miller "got the license plates," though prosecutrix says she paid for them. Both took several rides together. One evening they drove down to Blackfoot and got back about 3 o'clock in the morning. He was permitted to take the car to Mackay, Shoshone and Hailey, since the prosecutrix "trusted him." On or about October 15th, he asked for the car to go to Spencer. She consented, and, according to him, washed him some socks and handkerchiefs, packed his grips and kissed him good-bye. She denied packing his grips, did not deny the washing and admitted "I might have kissed him good-bye."

Instead of going to Spencer, appellant struck for Riverton, Wyoming, eventually winding up at Deadwood, South Dakota. From there, he telephoned prosecutrix twice, she calling him later. Her repeated demands that he bring the car back met with consistent refusals to do so until he got "good and ready": this third telephone communication was held on November 14th. With the Spencer yarn fresh in mind, either perturbed by the prospective loss of a cherished car or fearing the insidious influences of that particular type of blonde who one time launched a thousand ships before the topless towers of Ilium, the now thoroughly irate prosecutrix, on November 18th, swore out a complaint before the probate judge at Idaho Falls, charging appellant

with the theft of her car. He was apprehended at Rawlins, Wyoming, came back without extradition, underwent preliminary examination and was bound over for grand larceny. His motion to quash the information having ·been denied, a jury found him guilty as charged; and he is here on appeal.

■■ It was contended that the court erred in denying the motion to quash. The only grounds argued in the brief are addressed to the proceedings in the preliminary examination, viz.: total failure to prove venue, insufficiency of the evidence to establish any crime whatever, and certification of the transcript by one other than the county stenographer. Taking up these contentions *seriatim*, insufficiency of the evidence before the committing magistrate cannot be taken advantage of upon a motion to quash, unless the statute specifically permits it. (Annotation to *State v. Chance*, 29 N. M. 34, 31 A. L. R. 1466, at p. 1479, 221 Pac. 183.) C. S., sec. 8863, gives no such permission. This court has heretofore announced the rule in *State v. Foell*, 37 Ida. 722, 217. Pac. 608. That failure to lay revenue cannot serve as a basis of such motion was squarely passed upon in *People v. Panagoit*, 25 Cal. App. 158, 143 Pac. 70.

■ The transcript of the testimony was certified by Bessie Mattinson as the "duly appointed acting stenographer of Bonneville County." The probate judge also certified that the "testimonies were written in shorthand and transcribed by Bessie Mattinson, Acting Bonneville County Stenographer" and that the transcript "is a true and correct account of the taking of the said testimonies." Subdivisions 2 and 3 of C. S., sec. 8754, were, therefore, fully complied with.

■ At the trial, appellant objected to the testimony of the prosecutrix, insisting that her decree of divorce was null and void. To substantiate this contention, he submitted in evidence the judgment-roll, pointing out that the complaint and the jurat attending its verification had been signed with a typewriter, no pen signatures appearing. It

was furthermore objected that the record did not affirmatively show that the summons had been delivered to the sheriff, precluding a *prima facie* showing of due diligence. None of these contentions can be entertained upon a collateral attack. All presumptions are in favor of the judgment of a court of record; and, unless it affirmatively appears from the judgment-roll that there was failure in some vital process or requirement, the judgment cannot be questioned. As a matter of fact, the original summons was issued June 22, 1931. An affidavit of plaintiff's attorney, filed on June 29th, stated that, after the summons was placed in the hands of the Bonneville county sheriff, the defendant immediately left the state of Idaho, was at the time without the state and could not after due diligence be found within the state: it further stated that affiant had been informed and believed that the defendant was in Salt Lake City, Utah. Upon this affidavit, an order was made that service of summons be made without the state. The summons received by the sheriff of Salt Lake county, Utah, upon June 30th, was by him returned on July 16th with the certification that, after due search and inquiry, he could not find the defendant in his county and was informed and believed that he was not then in the state of Utah. Thereafter, upon proper affidavit of plaintiff, an *alias* summons was issued on July 28th, an order for service by publication being made the same day: full compliance with such order was evidenced by the publisher's affidavit. The judgment would have been immune even to direct attack. Both plaintiff and her attorney had recognized and adopted the typed signatures complained of. As to the error charged for that the trial court refused an advisory instruction to acquit, we again observe that such a refusal is not reviewable by this court. (*State v. McClurg*, 50 Ida. 762, 300 Pac. 898; *State v. Stevens*, 48 Ida. 335, 282 Pac. 93.)

The remaining specifications that the evidence was insufficient and that the court should have sustained appellant's motion to discharge the jury can be disposed of together. Appellant insists that the evidence showed con-

sent upon the part of prosecutrix, but utterly failed to establish her ownership or appellant's felonious intent. Upon substantial evidence, the jury resolved the issues of ownership and consent against him; we think rightly. Not so, however, as to the issue of felonious intent. The entire record discloses a course of consistent comradery between the couple. Appellant detailed without denial his conversation with prosecutrix when he arrived at Idaho Falls eight days after the divorce:

"Well, I was told she had a divorce. I called her up, and I says, 'I hear you are a free woman.' She says, 'Not that I know anything about.' I says, 'That's what I heard.' She says, 'Not I.' And I says, 'What are you doing?' And she says, 'Talking to you.' I says, 'Well, I know that.' She asked me where I was, and I said, 'Across the street.' She says, 'Over to the Grand?' and I says, 'No; over to the Bingham.' She says, 'Are you coming over?' and I said, 'No; I don't think so.' I said, 'I just got in, and I am going to eat.' She says, 'When?' And I says, 'In a few minutes.' She says, 'Well, wait, and I'll come over.' "

And, as hereinbefore related, she did come over.

Although legally discarded by the wife of his bosom, she concealed his true status from him, by word and deed assuring him contrariwise until the day of the trial, when he first discovered himself bereft. "She" had had him arrested so many times he couldn't "keep track of them." Of him, she told witness, Fisher, "that, if anybody should help Mr. Miller, it should be the woman he always helped, the woman he took money away from me and give her, and had her forge my name to a chattel mortgage on a car that Mr. Miller and I owned jointly, to buy this hotel for her." Yet, upon the eves of his chronic excursions, "in every instance," she asked him to write to her. Though far fields might insistently call, the wanderer always came back, apparently because, like the famous feline, "he couldn't stay away." With much truth, his return greeting might have been: "I have been true to you, Cynara,

after my fashion." Altogether, the couple knew each other passing well, ever keeping in touch. She knew he was heading for Rawlins, when she had him arrested. From thence he was coming to Idaho Falls. Did she ever believe he purposed stealing the car? Listen to witness Fisher: "Well, I asked her, if she really thought that Mr. Miller intended to steal the car, and she said, 'No; I don't think he did. But he intended to keep it until he got damned good and ready to bring it back, and then it would be worn out.'" Unchallenged, her reputed declaration stands "even unto this day." And, who better than she could divine appellant's motive? Knowing his ex-wife as he did and believing himself still appurtenant, what more natural than that he should practice conversely the Tar Heel doctrine of "What's hern's hern and what's hisn's hern"? The record discloses evidence of a number of things, but, that appellant intended permanently to separate prosecutrix from her car is not one of them.

Judgment reversed.

Budge, Varian and Leeper, JJ., concur.

Givens, J., dissents.