## Hickey v. Commonwealth.

(Decided October 31, 1919.)

### Appeal from Whitley Circuit Court.

1. Criminal Law—Evidence of Other Crimes—Argument of Counsel. —Evidence of other crimes committed by defendant, for which he had previously been arrested, is not admissible under section 597 of the Civil Code, except to show motive, or as constituting part of the res gestae, or in cases where the defendant takes the witness stand, when it may be shown that he has been convicted of a felony. Where these exceptions do not exist it is error to admit such evidence and to allow the counsel for the Commonwealth to base his arguments to the jury upon such evidence.

2. Arrest—Mode of Making Arrest.—An officer, in making an arrest, is excused from complying with the requirements of section 39, Criminal Code, if the offender knows the offense with which he is charged and of the intention to arrest him, or if under a warrant, he knows of the warrant and the offense charged in it; or, if the resistance is sudden and with such force as to prevent the officer from complying with the section.

3. Arrest—Authority to Arrest Without Warrant.—Where a person accused of a misdemeanor resists arrest by an officer acting under proper authority and shoots at the officer, the act of so shooting at the officer constitutes a felony committed in the presence of the officer, and he is authorized to arrest the accused upon the felony charge, without a warrant, and with the consequent protection given by law to an officer in making arrests for that character of offense, which is that if necessary to overcome resistance and force, he may kill the accused, though not in danger himself of life or limb at the hands of the accused.

4. Criminal Law—Self-Defense—Instructions.—An instruction that "if the jury believe . . . that defendant . . . commenced the difficulty by shooting at deceased" or that defendant and deceased "engaged in such conflict by mutual consent" the defendant cannot rely upon the right of self-defense, is erroneous where there is nothing in the testimony showing either state of facts to exist.

5. Criminal Law—When Deposition May Not Be Used.—A deposition taken by the defense but not read in the trial of the case may not be used by the prosecution without the consent of the defend-

ant, and it is error for the prosecution to be permitted to show before the jury that such deposition had been taken and is among the papers in the case.

HENRY C. GILLIS, TYE & SILER, and B. B. SNYDER for appellant.

CHARLES H. MORRIS, Attorney General, and BEVERLY M. VINCENT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, Hickey, upon his trial in the Whitley circuit court, under an indictment for murder, charging him with killing Riley Bray, was convicted of the offense of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for two years, and to reverse the judgment rendered upon that verdict he prosecutes this appeal.

Numerous errors are relied upon in the motion for a new trial as grounds for setting aside the judgment, some of which we regard, as will hereafter appear, as meritorious, while others are clearly immaterial. Those which we regard of sufficient importance to require our consideration are (1) improper testimony introduced by the Commonwealth over the objections of the defendant, and (2) error in the instructions submitted to the jury. Before taking up either of these grounds we deem it necessary to make a brief statement of the facts.

The defendant was a constable in the magisterial district in which the town of Gatliff is located. Prior to April 8, 1918, he had arrested the deceased, while in a picture show, in Gatliff, for some misdemeanor which the record does not disclose, and in making the arrest the deceased resisted him to the extent of drawing a knife upon defendant, and at his instance a justice of the peace issued a warrant against deceased some days afterward, charging him with the offense of resisting an officer. Defendant carried this warrant from the date of its issue until the 19th day of June, 1918, when the killing occurred at about eleven o'clock p. m. Between the time of the issuing of the warrant and the date of the killing defendant had made many searches in an endeavor to find and arrest the deceased, but the latter successfully evaded the officer and made several threats that if the defendant attempted to arrest him he (deceased) would kill him, and at some of the times when these threats were made deceased exhibited a large pistol with

which he proposed to carry out his threat. On the morning of the day upon which the killing occurred defendant received information that one Shumate, a deserter from the U. S. Army, was in the town of Packard, some distance from Gatliff, the two towns being located upon the same line of railroad. He summoned Jake Kellar to go with him to Packard and assist in arresting Shumate, and the two, after apprehending the deserter, and in company with him, started walking the railroad track from Packard to Gatliff. Shumate was walking in the middle of the track with Kellar at his left and the defendant at his right, when, at about eleven o'clock in the night, they met deceased and his wife going in the opposite direction, both traveling in the path at the end of the ties to the left of Kellar and on the opposite side from the defendant. After separation for a distance of about thirty feet Kellar suggested that the man was Riley Bray for whom the defendant had the warrant of arrest, which, as we have seen, he had been carrying since the 8th day of April prior thereto. The only witnesses who testified upon the trial as to what occurred at this point were Mollie Bray the wife of deceased, Kellar and the defendant. The night was dark and no one carried lights. Deceased was carrying upon his right shoulder as he traveled a pick and a shovel, with a forty-five, improved, Colt's revolver in his left hand. In her testimony Mrs. Bray, who was introduced by the Commonwealth, said:

"Q. In your own way tell the jury where you met Hickey and who, if any one, was with him? A. We met Mr. Hickey and two men with him. Q. When you met them did you know who they were, any of them? A. No, when we met them I did not know who they were. Q. What happened then? A. It happened that Mr. Hickey called 'is that you Riley Bray?' Q. He did this before you got to him? A. No, we passed him. Q. How far? A. Just a few steps. Q. Then did you know Mr. Hickey's voice? A. Yes, sir. Q. You knew when he called that it was Mr. Hickey? A. Yes, sir. Q. What did he say? A. Said 'is that you Riley Bray,' and Riley made no answer but stepped on. Q. Still walked on? A. Yes, sir. Q. What next? A. Then he called two times and said 'halt Riley Bray' and my man turned around and said he done halted, by that time I turned my head and saw Mr. Hickey come on him with a gun on him and by that time I heard the shooting commence and by that time they shot right on until the guns were emptied. Q.

If I understand you you had passed those three men and your back was to them first? A. I turned my head. Q. When did you turn your head? A. When Riley said he halted.''

She afterward said that her husband had his pistol in his left hand when defendant first spoke to him, and that she did not see who fired the first shot, because she had stepped in front of her husband and had her back to the parties. The defendant, testifying as to what happened at the time, said:

''Just as we passed these parties Kellar said to me 'there is Riley Bray.' Q. Was Bray there in hearing distance? A. Yes, sir. Q. What did you do then when you got information that Bray was there? A. I turned in the direction of Packard and said 'is that you Riley' and he made no answer and then I said to him 'wait Riley' and he didn't wait and I started back in that direction and called the second time for him to wait and I had a warrant for him and he did not attempt to stop and a moment after that I caught up with him or got up opposite him the time and he was standing in the path at the end of the ties where I was and I ordered him to halt and he turned around and said 'I have halted' and about that time fired. Q. Who fired? A. Riley Bray. Q. What fired? A. A pistol. Q. At what? A. Me. Q. Go ahead. A. As soon as I got—I had my coat off and as soon as I could—I had my coat off and folded under my arm and my pistol under my left arm and my hand on the butt of the pistol and that made it part of the way out of the holster and as soon as I could get it after his gun fired I pulled my gun and began shooting and we two stood there and shot until we shot empty. Q. Who fired the first shot fired? A. Riley Bray. Q. Who fired the second? A. Not much difference in my first and Riley's second. Q. How many times did you shoot? A. Six. Q. How many times did he shoot. A. Six.''

The testimony of Kellar as to what happened is to this effect:

''Q. What occurred when you saw somebody coming toward you? A. We saw them a good little bit before we met them, or I did and I recognized who it was and thought John was going to and John did not seem to notice who it was and just as we passed them I said, 'there is Riley Bray now' and we all stopped. Q. What occurred. A. He turned around and said to Riley, 'is

that you Riley' I believe is the way he spoke and Riley kept walking and he asked Riley to stop and said 'stop, wait Riley a minute I have got a warrant for you' and he did not stop yet and he told him to halt and when he said that Riley stopped and turned around and said 'I have halted' and Riley fired a shot. Q. Whom did he shoot at? A. Mr. Hickey the best I could tell shooting straight at him. Q. You see that? A. Yes, sir. Q. What did Hickey do after Riley shot at him? A. Returned the shot. Q. Who shot second? A. I could not say Riley Bray's second shot and John's first were so close together that I could not say positively who did fire the second shot."

A witness for the Commonwealth testified that upon one occasion when defendant was searching for the deceased he said that he "would go over there (where deceased was) and take a shot at him," but the witness stated that the remark was made while defendant was "just laughing and talking with dab." Another witness testified that defendant said "that damn woman was going to keep on until she caused him (deceased) to be killed," the woman referred to being the wife of deceased. Another witness testified that he heard defendant say that if he ever got his hands on Riley Bray he would never bother anyone else. Defendant denied each of the statements which the Commonwealth's witnesses attributed to him, and the record contains much impeaching testimony introduced by both the Commonwealth and the defendant. On the day defendant had his examining trial and after the court had discharged him, he and another were riding in an automobile on the streets of Williamsburg, and they had in the car with them Mrs. Julia Merritt, the wife of Charles Merritt and a sister of Mrs. Bray. The husband, Charles Merritt, for some cause became offended because his wife was riding in the automobile with defendant and he procured a warrant for the latter, but what offense was charged in it is not shown by the record. It was afterwards dismissed without a trial. While Charles Merritt and his wife were testifying as witnesses for defendant the Commonwealth was permitted, over the objections and exceptions of the defendant, to interrogate them about that warrant and the defendant's arrest under it, and this is a part of the erroneously admitted testimony of which defendant complains on this appeal under ground (1). That the testimony was wholly in-

competent as well as prejudicial there can be no doubt. If the purpose of its introduction was to contradict or impeach the defendant or Mrs. Merritt it was not permissible under section 597 of the Civil Code, for that section expressly forbids the introduction of particular wrongful acts as impeaching testimony except that it may be shown that the witness has been convicted of a .felony. The rule is that a separate and distinct offense from the one for which the defendant is being tried may not be introduced except for the purpose of showing motive, identity, knowledge, etc., or as constituting a part of· the *res gestae,* where its commission is so closely connected with the one being tried as to be inseparable from it. It is thus stated in Ochsner v. Commonwealth, 128 Ky. 762:

"It is never permissible to prove that one on trial charged with a particular offense has committed some other offense, except to show motive, or where it is part of the *res gestae,* unless the defendant has offered himself as a witness, when he may be impeached by evidence of his having been convicted of another crime that is a felony. Section 954, Roberson's. Cr. Law; Commonwealth v. Welch, 111 Ky. 530, 22 Ky. Law Rep. 851, 63 S. W. 984; Powers v. Commonwealth, 110 Ky. 386, 22 Ky. Law Rep. 1807, 61 S. W. 735, 63 S. W. 976, 53 L. R. A. 245; Howard v. Commonwealth, 110 Ky. 356, 22 Ky. Law Rep. 1845. 61 S. W. 756; Pennington v. Commonwealth, 51 S. W. 818, 21 Ky. Law Rep. 406."

The latest pronouncement of this court upon the subject will be found in the recent case of Thomas v. Commonwealth, 185 Ky. 226, wherein the rule is thus stated:

"The general rule is that on the prosecution of a particular crime, evidence which in any manner shows or tends to show that accused has committed another crime, wholly independent of that for which accused is being tried, is irrelevant and inadmissible. There are several well recognized exceptions to this rule, however, and those exceptions are founded on as much wisdom and justice as the rule itself. The general rule does not apply where the evidence of another crime tends directly to prove defendant's guilt of the crime charged. Evidence of other crimes is admissible to prove particular matters such as the identity of accused, also the motive, intention, or knowledge. Such evidence is likewise admissible when two or more crimes are so linked together in point of time or circumstances that one cannot be

fully shown without proving the other. 16 C. J. 586, et seq.; 8 R. C. L. 204; Morse v. Commonwealth, 129 Ky. 294, 111 S. W. 714.''

The evidence now being considered was not admissible for any of the purposes enumerated. It had no connection with the crime for which defendant was being tried, and was not part of the *res gestae,* nor did it furnish any motive for the killing of deceased.

Its only effect was to place the defendant in bad odor with the jury, and especially after the argument of counsel for the prosecution based upon it, and of which complaint is also made, but since the testimony will be eliminated upon another trial there will be no occasion for the complained of argument and we will notice it no further.

Briefly considering ground (2) relied on for a reversal, the record discloses that the court gave to the jury eight instructions, to the giving of each of which the defendant objected. They are too long to be copied in this opinion. Suffice it to say that a close examination of them fails to convince us of any error except as to numbers seven and eight. The first of those (No. 7) attempts to define the duties and rights of the defendant as an officer in making an arrest as well as the duty of the deceased to submit to the arrest. It submits to the jury the fact as to whether the defendant had at the time a warrant for the arrest of the deceased, when the record disclosed beyond question that he did have the warrant at that time. It furthermore failed to incorporate and submit to the jury the rights of the defendant as an officer, if the deceased had committed a felony in his presence, when the testimony showed that the latter had actually fired upon the defendant when he was attempting to make the arrest, and lastly, it confined the right of the defendant to kill the deceased to the single ground of self-defense. Under the provisions of section 36 of the Criminal Code an officer may make an arrest in obedience to a warrant, and without a warrant if the offense was committed in his presence, or, if the crime is a felony and he has reasonable grounds to believe that it has been committed. It is the officer's duty, if acting under a warrant, to inform the person about to be arrested of the intention to arrest him, and the offense with which he is charged, and, if required, he should show the warrant to the defendant therein (section 39 Criminal Code). But if the defendant in the warrant

knows that the officer has it and knows the offense charged against him it is not necessary that the officer should give the information required by that section of the Criminal Code. (Bowling v. Commonwealth, 7 Ky. Law. Rep. 821; Tuck v. Beliles, 153 Ky. 848; Reed v. Commonwealth, 125 Ky. 126). It has also been held that although the defendant in a warrant may not have known that the officer had it in his possession, or of the offense charged therein, the officer would be excused from complying with the provisions of section 39 of the Criminal Code if, on account of the sudden action and resistance of the accused, he was deprived of an opportunity of doing so. Commonwealth v. West, 113 S. W. Reporter (Ky.) 76, and Tuck v. Beliles, *supra*. In effecting an arrest, conceding that the officer has authority to do so, if the charge is a misdemeanor the officer has no right to kill the offender, except in the exercise of the right of self-defense. Nor can he kill the accused, if arrested only for a misdemeanor, in order to recapture him after he has escaped, but while the prisoner is in his custody he may use such force as may be necessary or reasonably appear to him to be necessary in order to prevent an escape, even to the taking of the life of the prisoner, and without invoking the right of self-defense. Stevens v. Commonwealth, 124 Ky. 32; Reed v. Commonwealth, 125 Ky. 126, and Smith v. Commonwealth, 176 Ky. 466. This rule, as applied to misdemeanor charges, is thus stated in the latter case:

"While it is true that an officer in arresting one guilty of a misdemeanor, is never justified in killing merely to effect the arrest, or to prevent his escape by flight, yet, if the misdemeanant be under arrest, and attempts by force and violence to overcome the officer and effect his escape, the officer's right to kill is not limited to the single ground of self-defense, but he may use such force as is necessary, or reasonably appears to him to be necessary, but no more, to overcome the forcible resistence of the prisoner; and, if under these circumstances, he shoots and kills the prisoner, the killing will be excusable if the officer could not, or it reasonably appeared to him that he could not, otherwise overcome such forcible resistance. Stevens v. Commonwealth, 124 Ky. 32, and Reed v. Commonwealth, 125 Ky. 126."

If, however, under the provisions of section 36, *supra,* of the Criminal Code, the officer is attempting to arrest the prisoner upon a felony charge he may use such force

in effecting the arrest as is necessary, or appears to him in the exercise of a reasonable discretion to be necessary, even to the taking of the life of the prisoner in resisting the force which he may offer to prevent the arrest. Other cases bearing upon the questions now being considered are Kammerer v. Commonwealth, 137 Ky. 315; Ayers v. Commonwealth, 32 Ky. Law Rep. 1234, and Commonwealth v. Marcum, 135 Ky. 1.

In the case of Reed v. Commonwealth, *supra,* the officer was attempting to arrest the accused upon a misdemeanor charge. In doing so the misdemeanant, in resisting arrest, shot at the officer, which is a felony in this state, and the court held that this constituted a felony committed in the presence of the officer and authorized him to arrest the accused upon a felony charge, with the consequent protection given by the law to an officer in making arrests for that character of offense. In so holding this court said: "It is useless to discuss the power of the acting police judge, who saw the act of lawlessness, or to decide whether he had the right, without issuing a warrant for Frisby, to command Marshall Day to arrest him, for the latter had the right, as a peace officer, to make the arrest without a warrant and without an order from the acting police judge to do so, as Frisby fired the pistol in his presence and hearing." Following that rule the court in the instant case should have submitted to the jury in instruction 7, or some other one, the right and duty of the defendant to make the arrest of the deceased upon a felony charge if the jury believed, as the testimony undoubtedly showed, that the deceased resisted the arrest under the warrant held by defendant, and in doing so committed a felony in his presence by shooting at him.

Instruction 8 complained of has no place under the facts of this case. It says:

"But, if the jury believe from all the evidence, beyond a reasonable doubt, defendant, when he met the said Riley Bray, commenced the difficulty by shooting at him, or, that defendant met the deceased and both parties were armed and determined on a conflict and did engage in such conflict by mutual consent, then in either such event the defendant cannot rely on the right of self-defense."

There is nothing in the testimony tending to show in the slightest degree that defendant commenced the difficulty by shooting at the deceased, or that the meeting was the result of any mutual consent to engage in an

armed conflict so as to limit the right of self-defense on the part of the defendant.

Another matter we feel should be briefly mentioned is that attorneys for defendant took the deposition of Shumate upon interrogatories, he now being confined in a Federal prison upon the charge of desertion from military service. For some reason that deposition was not read by the defendant, but the Commonwealth was permitted to show that the deposition had been taken and was then on file in the papers in the case, and even offered to read it to the jury, all of which occurred in the presence of the jury. The defendant had the right to decline to read the deposition, and the Commonwealth could not read it without his consent, and we think it was error for the Commonwealth to be permitted to make the display before the jury with reference to this deposition that we find in the record.

Other errors in the admission of testimony complained of are not discussed or referred to, since we do not regard them of sufficient materiality to authorize a reversal, but for the errors indicated the judgment is reversed with directions to grant the defendant a new trial and for proceedings consistent herewith.