## Sizemore v. Commonwealth.
June 16, 1939.

Harvey Parker, Jr., Judge.

John F. Coldiron and Rinehart S. Shepherd for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE RATLIFF— Reversing.

Appellant was indicted by the grand jury of Greenup County, Kentucky, for the wilful murder of William Baker. He was tried at the September 1938 term of the Greenup Circuit Court, found guilty of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for two years. He has appealed.

In brief of appellant the grounds urged for reversal of the judgment are, that the verdict is not supported by the evidence and was the result of passion and prejudice on the part of the jury; and that the instructions given to the jury are prejudicially erroneous.

The homicide occurred near midnight on May 21, 1938, in the restaurant of Fred Ferguson in South Portsmouth, Greenup County, Kentucky, which lies on the south side of the Ohio River, opposite the city of Portsmouth, Ohio—the two towns being connected by a bridge across the Ohio River. The appellant was a constable of Magisterial District No. 4, Greenup County, and the deceased was a deputy game warden of the State of Kentucky.

We will first review the evidence produced by the commonwealth. James Baker, the father of the deceased, who lived in the village of Beattyville, between a quarter and a half a mile below the South Portsmouth end of the bridge where the homicide occurred, testified that his son, the deceased, came to his home about 10 o'clock P. M., on the night of the occurrence in company with a girl friend, Helen Brady, and Tom Roberts; that Dick McGlone was at his home when they arrived and they stayed there about 30 minutes. The deceased was going to take Miss Brady back to town and asked the others present to go with him to the bridge and wait at the toll bridge on the Kentucky side for him. On their way toward the bridge the appellant drove up in his car and stopped it and told Dick McGlone to turn around and go back home, and McGlone said, "I am

going on up to the bridge and then I am going back home;'' that none of them were drunk or disorderly and when McGlone told appellant that he was going to the bridge, and ''then we were all coming back home when we got ready,'' appellant threw the car door open and jumped out with his gun in his hand and came toward them. He was asked what they were doing at that time, and he said, ''We weren't doing a thing in the world;'' that the deceased who was a few feet in front of the others, came back and an argument ensued between him and appellant and appellant said that he had a call or information that they were disturbing somebody, but refused to tell from whom he got his information. Appellant then got out of his car with his gun in his hand and then got back in his car and went up the road; the deceased and his companions then went to Fred Ferguson's restaurant and ordered a sandwich and some beer, but up to that time neither the deceased nor any of his companions had drunk anything. The deceased and Miss Brady sat down in a booth in the restaurant and the deceased laid his two guns over behind the counter on a bench about 15 or 18 feet from where he was seated. In about 30 minutes appellant and James Timberlake, a deputy sheriff of Greenup County, came into the restaurant and appellant had his gun in his hand and approached the deceased and drew the gun on him and told him to raise up to his feet and that he was going to search him; the deceased raised and held his hands up and appellant searched him, but found no guns or other weapons on his person; appellant then turned to McGlone and searched him, but found no weapons on him; and then he turned to the witness, James Baker, and searched him, and stepped around by his side and shot the deceased. He further testified in substance that the deceased had nothing in his hands nor was he attempting to do anything to appellant at the time. He said that the appellant never said anything about arresting anybody at all, but merely approached them and searched them in the manner indicated above.

Helen Brady's evidence concerning what occurred near the bridge when appellant stopped them on the road, was in substance the same as the evidence of James Baker. She further said, that after appellant told them that complaint had been made that they were disorderly and disturbing people, but refused to reveal his informant, and after he got back in his car, de-

ceased walked over to the side of the car and said, "Bill, let's be friends," and said, "Let me buy you a drink," and when appellant started off, he said, "I am not through with you yet." She further said there was no effort to arrest anyone and that they were all sober and orderly. Miss Brady's evidence relating to what happened in Ferguson's restaurant, was, in substance, the same as that given by James Baker. Dick McGlone and Tom Roberts also testified, and their testimony relating to what occurred on the road before they went to the restaurant and also what occurred in the restaurant, corroborated the evidence of James Baker and Miss Brady.

Without further detailing the evidence produced for the commonwealth, it is sufficient to say that if the witnesses for the commonwealth are to be believed, the homicide was inexcusable.

However, the evidence of appellant and his witnesses is in sharp conflict with the evidence of the commonwealth's witnesses.

Appellant testified that he received information that some drunk people were coming up the road, using loud talk, staggering and disturbing people, and he went down the highway to an Inn, thinking perhaps they might stop at that place. He failed to find them there and, it being near closing time, the lady who operated the place, asked him to take her home, and on his way to her home, he passed the deceased and his companions mentioned above, and on his way back he met them coming up the road. He said he called McGlone over to his car and told him he was drinking and suggested that he go home and get off the highway. McGlone said, "G—— d—— you, I never was in no trouble and I am not going home now," and began to argue with him; he then got out of the car and laid his hand on McGlone's shoulder and told him to get in the machine and that he was under arrest; that at about that time the deceased came up behind him and hit him with his fist and he shoved the deceased away and deceased said, "Alright, if that is the way you feel about it," and pulled a gun out of his pocket and then reached and pulled another gun out of another pocket and said to him (the appellant), "Don't reach for yours." The witness was asked if he succeeded in making the arrest there and he said he did not and was forced to turn McGlone loose

at the point of two guns and got in the machine and drove on up to the liquor store and called Jim Timberlake on the telephone and Timberlake said his machine was not at home and he told him he would come and get him. He was asked why he called Timberlake, and he answered, "I was forced to turn Dick McGlone loose or my life and I figured that they had committed a felony." He said that he told Timberlake what had happened and he and Timberlake later found the deceased and his companions at the Ferguson restaurant where the homicide occurred. He opened the restaurant door and entered the restaurant with Timberlake just behind him and at about that time the deceased raised up from his seat and said, "There is that G— d—— thing coming again," and they walked on in and he went to the booth where the deceased was sitting and told him he was under arrest and to stand up; the deceased stood up and he searched him, but found no weapons, and told him to stand over by the side of the deputy sheriff; he then turned to McGlone and told him he was under arrest, too, and searched him; at about that time, James Baker, father of the deceased, staggered up to the booth holding onto the side of it and he then proceeded to search him and while he was doing so, the deceased said, "G— d—— you, you can't treat the old man that way," and he then turned and looked back by the counter and the deceased had two guns drawn on him, and Timberlake said, "Put them down, you are under arrest," and the deceased said, "Who in the hell are you;" Timberlake pulled his coat back, showing his badge, and told him he was a deputy sheriff, and the deceased said, "You are too G— d—— small, I can shoot around you," and the two guns were cocked at that time and deceased was still coming toward him; he then pulled James Baker in front of him or between him and the deceased and told the deceased to stop where he was, and James Baker said to the deceased, "Don't shoot now, Bill, you will shoot me," and James Baker was still trying to get from between them to put him in line so the deceased could shoot him and when the deceased got around to where he could shoot him (the appellant), he then shot the deceased to keep from getting killed himself.

Fred Ferguson, the proprietor of the restaurant, testified that just before the shot was fired he heard the deceased say to appellant, or to Timberlake, in sub-

stance, to come there and get the guns and said, "Here they are, come and get them," and he then heard appellant tell the deceased to stop there, but the deceased kept on advancing or going in the direction of appellant with a gun in each hand, but he did not notice whether or not they were cocked. He said he did not notice appellant draw any gun until after he heard him tell the deceased to stop.

The evidence of James Timberlake who testified for appellant, was, in substance, about the same as that of appellant and Fred Ferguson. It is thus seen that according to the evidence of the appellant and his witnesses, the homicide was excusable. However, the jury being the judge of the evidence and the credibility of the witnesses, it had the right to believe either the theory of the commonwealth or that of the appellant. In view of the evidence of the four witnesses who testified for the commonwealth, there is no escape from the conclusion that the evidence is sufficient to sustain the verdict, although it may be conceded that the verdict is against the preponderance of the evidence.

We now come to a consideration of the instructions. By Instruction No. 1 the jury was instructed that it was the duty of the officer (the appellant) making the arrest to inform the person (the deceased) about to be arrested of the intention to arrest him and of the offense charged against him for which he was about to be arrested.

In view of the circumstances in this case, it is doubtful that it was necessary for appellant to impart to the deceased the information required in the instructions indicated above. In Dale v. Com., 186 Ky. 510, 217 S. W. 363, 364, in discussing the necessity of the arresting officer in informing the person about to be arrested of his intention to do so, the nature of the offense, etc., the court said:

"Ordinarily these duties are required of an officer in making an arrest (Criminal Code, Section 39), but he need not observe them when the offender knows that he is being pursued for the purpose of arrest, and knows the offense with which he is charged."

It is not denied that the deceased knew the appellant was a constable and in view of the previous encoun-

ter between appellant, the deceased and his companions, before they were apprehended at the restaurant where the homicide occurred, it is reasonable to presume that the deceased was already possessed of the information required of the officer, as indicated in the instruction. We think this instruction should have been modified by telling the jury in substance that this duty devolved upon appellant, unless the jury believed from the evidence that the deceased was already possessed of this knowledge, in which event it was unnecessary. Further complaint is made that the court instructed the jury that it was the duty of appellant to take the deceased before the most convenient magistrate. This is in the language of the Code, Section 46, Criminal Code of Practice, but for the purpose of this case, we do not think it was necessary, since that question was not in issue. Whether or not it was a prejudicial error we need not determine, but upon another trial of the case, it might be well to omit this instruction.

By Instruction No. 5 the jury was told that if they believed from the evidence that the deceased was drunk and disorderly or pointed a pistol at the defendant in the presence of the defendant, the latter being a constable, he had the right to arrest the deceased without a warrant. Complaint is made that the language "drunk and disorderly," was prejudicially erroneous, since under that language the jury might have believed that the deceased was drunk, but not disorderly and, since he was not disorderly, the appellant had no right to arrest him. If the deceased was drunk in a public place in the presence of appellant, the latter had the right, and it was his duty, to arrest him whether or not he was also disorderly. The words "and disorderly" following the word "drunk" should have been omitted, since such language might reasonably be calculated to mislead the jury, as we have indicated.

By Instruction No. 5, the jury was further instructed:

"* * *, and if you further believe from the evidence that after the defendant had placed Baker under arrest, the deceased Baker attempted by force or violence to effect his release from defendant's custody as an officer by drawing a pistol or pistols on defendant, then the defendant had the right to use such force as was necessary, or reason-

ably appeared to him to be necessary, but no more, to overcome such force and violence on the part of the deceased in his efforts, if any, to effect his release and if under these circumstances the defendant shot and killed Baker, the killing was justifiable and you will acquit the defendant if you believe from the evidence that the defendant could not or it reasonably appeared to him that he could not otherwise overcome such force and violence, if any, on the part of the deceased.''

It is thus seen that the instruction quoted above only submitted to the jury appellant's right to retain the deceased in custody after his arrest, but did not submit to the jury appellant's right to protect himself in arresting James Baker or retaining him in custody, if he had already arrested him. If James Baker was drunk in the presence of appellant in a public place, appellant had the right to arrest him, and if the arrest was effected, he had the further right to search him, and the deceased had no right to interfere with appellant in making the arrest and search of James Baker, and if he did so, then appellant had the right to use such force, and no more, than was necessary, or appeared to him to be necessary, in the exercise of reasonable judgment, to arrest James Baker and to retain custody of him, even to the extent of shooting and killing the deceased. The jury should have been instructed upon appellant's right, not only to protect his own life and to keep custody of the deceased, but also the right to arrest and keep the custody of James Baker and to resist any effort on the part of the deceased, to the extent indicated above, to release James Baker or otherwise interfere with his arrest. Hickey v. Com., 185 Ky. 570, 579, 215 S. W. 431; Smith v. Com., 176 Ky. 466, 195 S. W. 811.

Also, the jury should have been instructed on the duty of the deceased to submit to arrest and not offer any resistance thereto. Dale v. Com., supra.

Lastly, it is insisted that the court erred in instructing on voluntary manslaughter, since, it is argued, the appellant killed the deceased with malice and without provocation, or killed him in self-defense, or to arrest and retain custody of James Baker.

We have held under certain circumstances where the evidence clearly shows that the homicide was either

198

murder or no offense at all, it is improper to instruct the jury upon manslaughter or other phases of homicide not supported by any evidence. However, in view of the whole chain of circumstances, particularly the encounter between appellant and deceased a few minutes previous to the killing of the deceased, and what occurred in the restaurant immediately preceding the killing, might have furnished the jury grounds for believing that although it was not necessary for appellant to shoot and kill the deceased in the performance of his official duties or in his self-defense, or in the defense of another, yet he did so under sudden heat and provocation. We do not think the court erred in instructing the jury on voluntary manslaughter.

Because of the errors in the instructions, as we have indicated, the judgment is reversed and remanded for proceedings consistent with this opinion.

Whole court sitting.