Hubert **ARTHURS**, a Person of Unsound Mind and Annie Mae Arthurs, His Committee, Appellants,

v.

Mae **JOHNSON**, Widow of C. J. (Creed) Johnson, Deceased, Appellee.

Court of Appeals of Kentucky.

June 24, 1955.

Harvey Parker, Jr., Vanceburg, W. G. Kenton, Maysville, for appellants.

Jack R. Kibbey, Vanceburg, for appellee.

CULLEN, Commissioner.

C. J. (Creed) Johnson, a deputy sheriff of Lewis County, went with the sheriff and another deputy to the home of Hubert Arthurs for the purpose of taking him into custody on a warrant for a lunacy inquest. Johnson was killed by gunshots from inside the house. His widow brought this action to recover damages for wrongful death, against Arthurs, for whom in the meantime a committee had been appointed. The action was based upon KRS 411.150, which permits the widow to sue for a death caused by the "careless, wanton or malicious use of a deadly weapon, not in self-defense." The case was tried by the court without a jury, and the court gave judgment against the defendant for $7,500 compensatory damages. Arthurs, through the committee, has appealed.

The following grounds for reversal are asserted:

1. The proof showed that the plaintiff was not the legal widow of Johnson.

2. The evidence was not sufficient to establish that Arthurs was the person who fired the fatal shots.

3. The attempted arrest was not lawful, because the officers did not inform Arthurs that they had a warrant for his arrest; therefore, Arthurs had the right to resist the arrest with impunity.

4. The burden was upon the plaintiff to establish that the killing was not in self-defense, and this burden was not met.

1.

■ The evidence showed that the minister who performed the marriage ceremony for the Johnsons, some three years before the killing, was not legally qualified because he had not obtained a license as required by KRS 402.060. However, there was adequate proof that for several years the minister had held himself out to the public as having authority to perform marriage ceremonies; he had performed a number of ceremonies in the community; the Johnsons believe he had such authority, and they consummated the marriage and thereafter lived together as man and wife until Johnson's death. Under KRS 402.-070, this was sufficient to validate the marriage.

2.

■ The sheriff and his deputies went to Arthurs' home around 7:00 p. m., after having been informed by relatives of Arthurs that he was in a violent and dangerous mood, and was walking around the house with a shotgun in his hands, and after the relatives had made an affidavit for a lunacy inquest upon which a warrant had been issued. When the officers arrived, the house was dark. The sheriff went upon the front porch and engaged in conversation, through the closed door, with a man whom the sheriff identified by voice as being Hubert Arthurs. The sheriff requested Arthurs to come out, but he refused, saying among other things that he intended to "die with his boots on". The sheriff could hear another person in the house, whom he identified by "whimpering" sounds as being a woman, and who it is reasonably certain was Arthurs' wife. After a short time, Johnson fired a tear gas shell through a window of the house, and simultaneously was hit by gunshot fired from inside the house. He staggered up to the front porch and fell, and the sheriff and the other deputy temporarily withdrew. After some 20 minutes the sheriff again went to the front door and talked with Arthurs. The sheriff said: "You shot my deputy and I want to get him off the porch; the ambulance is here and I want to come up and get him off the porch and I want you to come out. I have to take you in." Arthurs replied that he was not coming out of the house. The sheriff then fired several pistol shots into the house, and was wounded in the hand by gunshot fired from inside the house. He was taken to a hospital, and returned some two and a half hours later with additional deputies, at which time they removed Johnson's body from the front porch. The evidence does not show when Arthurs eventually was taken into custody.

We think it is obvious that the evidence, although circumstantial, was sufficient to establish that Arthurs was the person who fired the fatal shots. He was in the house, armed with a shotgun, and in a violent and dangerous mood. He announced he was going to die with his boots on. His conversations with the sheriff, through the front door, indicated that he intended to resist being taken into custody. All the evidence pointed to him as the source of the gunshots from the house.

### 3.

Section 39 of the Criminal Code of Practice requires that in making an arrest under a warrant, the officer shall inform the person about to be arrested of the intent to arrest him, of the offense charged against him, and of the existence of the warrant. However, it has been held that it is not necessary to comply strictly with these requirements where the attitude of and character of resistance by the person to be arrested is such as to make compliance impractical or futile. Hickey v. Commonwealth, 185 Ky. 570, 215 S.W. 431; Tuck v. Beliles, 153 Ky. 848, 156 S.W. 883.

It is conceded that the sheriff here did not inform Arthurs in so many words that he was to be arrested, nor did the sheriff tell Arthurs that he had a warrant. Instead, believing that Arthurs was in such a mental state that it would only provoke him more to mention the warrant of arrest and the purpose of the arrest, the sheriff sought to procure custody of Arthurs by strategy and deception. The evidence shows that the sheriff, after identifying himself to Arthurs, endeavored to induce Arthurs to come out of the house on the pretext that there was an insurance agent there who wanted Arthurs to sign some papers. When Arthurs refused to come out, and insisted he was going to "die with his boots on," the sheriff tried to persuade him to come out and go to town. Arthurs knew the sheriff, and he also had recognized one of the deputies, Willard Harrison, in the yard. There is nothing to in-

dicate that Arthurs had any question in his mind as to the authority of the officers to arrest him, or any reason to fear that they had any purpose other than to take him into legal custody. On the contrary, the fact that he had barricaded himself in his house, with the lights out, before the officers arrived, shows that he was anticipating an effort to take him into custody and had determined in advance to resist the officers by force. Under the circumstances, we think it would have been a useless formality for the officers to have informed Arthurs that they had a warrant for his arrest. In accord with this view is the statement in 4 Am.Jur., Arrest, sec. 85, p. 60, that: "If a person fortifies himself in his home with the avowed intention of defying arrest to the extent of shedding blood, notice of purpose or demand for admission is not necessary."

### 4.

In actions under KRS 411.150, the burden is upon the *plaintiff* to prove that the killing was *not* in self-defense. Sturgeon v. Baker, 312 Ky. 338, 227 S.W.2d 202, 17 A.L.R.2d 593. We think the plaintiff here adequately met that burden.

The evidence establishes that Arthurs shot and killed Johnson, not because of any fear that Johnson and the other officers were planning to subject him to death or great bodily harm, but because he had determined to resist by force any effort to remove him from the house. Under these circumstances, even if the arresting procedure had been unlawful, Arthurs would have had no right to kill one of the officers in resisting the arrest. Smith v. Commonwealth, 196 Ky. 479, 244 S.W. 878.

Although the point is not argued, we may say in passing that there is precedent for imposing civil liability upon an insane person, under KRS 411.150, for a killing with a deadly weapon. See Young v. Young, 141 Ky. 76, 132 S.W. 155.

The judgment is affirmed.