## Hendrickson v. Commonwealth.

(Decided February 4, 1930.)

692

B. B. GOLDEN for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Moscoe Hendrickson appeals from a judgment convicting him of manslaughter and fixing his punishment at two years' imprisonment.

The evidence may be summarized as follows: The homicide occurred at the home of appellant's mother, Hannah Hendrickson, who lives on Straight creek, in Harlan county, about midway between the residence of the deceased, Ed Le Fever, and his father, Noah Le Fever. Moscoe Hendrickson, who lived at a mining camp at Molus some distance away, had gone to his mother's home to get some chickens. He was accompanied by Andrew Shrum, Carl Myers, and Lige Burnett. Ed Le Fever and his brother, Letcher Le Fever, had been engaged in cutting wood at the home of their father, Noah Le Fever. About 9 o'clock that night Ed Le Fever,

accompanied by Letcher, started to his home. According to evidence for the commonwealth, when they reached Hannah Hendrickson's residence Ed was playing a French harp, and the dog ran out and commenced to bark. Ed picked up a rock. Moscoe then ran out to the fence accompanied by his mother, and told Ed he would shoot him. Moscoe also told them to go back up the road At that time Moscoe had a pistol in his hands. The two Le Fevers then went toward the home of their father, Noah Le Fever. On reaching a point near the house, Letcher remained there and Ed went on up the road and returned with a gun. They were then joined by their father, who was also armed, and they started back down the highway. When they reached the home of Hannah Hendrickson, she had the door open just a little, and Ed said that Moscoe could not do him like he did. Noah told her to keep Moscoe in there and he would take Ed home. Hannah said that she could not do anything with Moscoe. Hannah then blew the light out. Moscoe came out and began firing. Ed Le Fever was struck twice. After Moscoe fired, Noah and Letcher returned the fire and numerous shots were fired. According to the evidence of appellant and his mother, the Le Fevers passed Hannah's home on three occasions. On one occasion Hannah was out in the yard with a light of some sort looking for a wire to use in connection with a carbide light, and they called out to her in a boisterous manner to put out the lights, and that they would return directly and put them out for her. About 30 minutes before the homicide the Le Fevers passed. Hannah's dog barked at them and they threatened to kill the dog. Hearing the discussion, Moscoe came out. Ed had his hand behind him in a threatening manner. Moscoe thought he had a pistol and drew his pistol on Ed and told Ed not to bring his pistol up. Ed replied that it was not a pistol. Bringing his hand from behind him, he threw the rock in the road. Hannah was much alarmed, took hold of Ed, and implored him not to have any trouble. She referred to the fact that they were neighbors and told him that she and Moscoe loved him and would not hurt him. Thereupon the Le Fevers left, stating that they would go and get their guns and come back and have a shooting match. When they returned they called out for Moscoe and asked him to come out. Hannah told them that Moscoe was not coming out. On recognizing Noah's voice, she called to him and asked to be allowed

694

to tell him how the other trouble had occurred. When she did this, some one of the three called her "a black liar." She said that Moscoe would stay in the house, and pleaded with Noah to take his boys and go on, and referred to the fact that they were neighbors. They told her that if Moscoe did not come out they would shoot the top of the house off. She replied that it would have to come off because Moscoe was not coming out. Ed Le Fever was the first to fire and was soon joined by the other two. Moscoe, who was then in the kitchen, ran out with his mother's Luger pistol and began shooting from the corner of the house near the chimney. During the melee Hannah ran to the kitchen, told the men there that if they were too cowardly to fight to let her have a pistol, and then snatched the pistol from the hands of one of them and fired the first shots that came from the house; all three of the Le Fevers shooting in the direction of the house. According to Mary Southers, who was in the kitchen, the Le Fevers passed twice and the first shots were fired from the road. According to Carl Myers, who also remained in the kitchen during the shooting, Moscoe was out when the first shot fired. The first he knew of the trouble, the Le Fevers and Moscoe got into an argument about the dog. They left saying something about having guns at the house. He corroborated Hannah and appellant as to the conversation that occurred just before the shooting. He did not state definitely where the first shooting came from. The evidence further discloses that several shots were fired into the house.

Under this evidence the jury might properly have found that the Le Fevers, being angered by Moscoe's conduct during the difficulty over the dog, went away, armed themselves, and then returned and began the subsequent difficulty in which Ed Le Fever was killed by first firing from the road. But although the evidence of Moscoe and his mother to that effect is supported by the testimony of two other witnesses, it is squarely in conflict with the testimony of Noah and Letcher Le Fever, who say that Hannah Hendrickson was unable to restrain Moscoe, and that he fired the first shots. Therefore the case is merely one where the numerical weight of the evidence favors the defendant, and it has been held in numerous cases that this alone will not justify the conclusion that the verdict is flagrantly against the

evidence, in view of the rule that the jury are the sole judges of the credibility of the witnesses and of the weight to be given their testimony. Sizemore v. Commonwealth, 195 Ky. 683, 243 S. W. 919.

In the course of his examination, Noah Le Fever, referring to his son Letcher, said, "He came back and told me Moscoe Hendrickson would not let him pass, that he was going to kill him if he did." Defendant's objection to this testimony was sustained and the jury admonished. Later on witness said, "He asked me to go home with him, Moscoe wouldn't let him pass." The objection was again sustained. Thereafter he said: "He asked me to go past the house with him. I went past the house with him." Again the court sustained the objection. It is insisted that the subsequent answers of the witness were in defiance of the court's ruling, and that the action of the court in sustaining the objection and admonishing the jury was not sufficient to remove from the minds of the jury the effect of the testimony. It is always difficult to restrain witnesses from giving hearsay testimony. Ordinarily, the exclusion of the evidence, though repeated, followed by an admonition not to consider it, will be sufficient to protect the rights of the accused. If in the opinion of counsel this is not sufficient to remove the effect of the evidence, or the witness persists in making statements that have been excluded, he should ask that the swearing of the jury be set aside. If he fails to do this, the judgment will not be reversed on the ground mentioned unless the circumstances are exceptional, a state of case not here presented.

Complaint is made that the witness Letcher Le Fever was permitted to answer, "Yes," to the question, "The first shot that was fired he came out the door and fired?" The witness had already testified that Moscoe Hendrickson fired the first shot. The purpose of the question was to find out where Moscoe was when he first fired, and, though somewhat leading, the failure of the court to sustain the objection cannot under the circumstances be regarded as prejudicial.

During the examination of appellant, he was asked whether or not he said in the presence of Joe Sweeten, a day or two before the homicide, that he was going to get a man for a Christmas present. The question was propounded in two different forms. Not only did appellant answer each question in the negative, but the court

696

declined to permit Sweeten to testify that the statement was made. In the circumstances it hardly can be said that appellant was prejudiced by the mere asking of the question.

The court did not err in refusing to permit Hannah Hendrickson to testify as to what Noah Le Fever said some time after the homicide.

Appellant makes the further point that the court erred in excluding from the jury the photograph of the Hendrickson home. It appears that when the photograph was first offered in evidence the commonwealth objected, and the court ruled that at that time it was not proper to pass the photograph to the jury. Afterwards the commonwealth withdrew its objection and the photograph was handed to and examined by the jury. During the examination of the photographer, it developed that a new door had been placed on the house, and that before taking the photograph the photographer marked the new door so as to make it conform in appearance to the old door which had been removed, and which, at the instance of appellant, had already been introduced in evidence and exhibited to the jury. When this situation developed, the court withdrew from the consideration of the jury that part of the photograph showing the marks on the door. Having before them the old door in which the bullet holes appeared, and the entire photograph, with the exception of the marks on the new door, there was presented to the jury a perfect picture of the house at the conclusion of the difficulty, and owing to the changed condition it was not error to exclude the photograph to the extent indicated in the court's ruling.

There are other instances in which it is claimed that the court ruled incorrectly in the admission or rejection of evidence. Each of the alleged errors has been carefully considered, and we do not find any of them of sufficient importance to justify a reversal of the judgment.

Lastly, it is insisted that the whole law of the case was not given, as the court failed to instruct on the right to defend one's home. The rule is that, wherever the owner is justified in defending his home, his servants and guests may exercise the same right. Roberson's New Kentucky Criminal Law and Procedure, sec. 293; Wright v. Commonwealth, 85 Ky. 132, 2 S. W. 904, 8 Ky. Law Rep. 718; Ogles v. Commonwealth, 11 S. W. 816, 11 Ky. Law Rep. 289; Wharton, Hom., sec. 533;

Cooper's Case Cro. Cor. 544. As appellant was a guest in his mother's home at the time of the homicide, the facts bring him within the rule, and the case turns on whether the circumstances were such as to give his mother the right to defend her habitation. While the right to act in defense of one's home is generally applied to cases of attempted forcible entry for the purpose of committing a felony, or of inflicting great bodily harm, or offering personal violence to a person dwelling or being therein, we have held that the same rule applies in case of attack or attempted attack on the home with firearms for any one of such purposes. Wright v. Commonwealth, supra. According to appellant, his mother, and other witnesses, the deceased and his brother Letcher, after the difficulty over the dog, announced that they would return and have a shooting match. They left, armed themselves, and returned with their father, who was also armed. They demanded that Moscoe come out, and said if he did not come out they would shoot the top of the house off. Hannah Hendrickson replied that it would have to come off as Moscoe was not coming out. Ed Le Fever then fired into the house, and the other two Le Fevers also began to fire. In view of this evidence there is no escape from the conclusion that appellant was entitled to an instruction on defense of the home, unless, as claimed by the commonwealth, the failure to give such instruction was not prejudicial error. The basis of this contention is that the court gave an instruction on self-defense, and the defense of the others in the home, which fully protected appellant's rights. As a matter of fact, however, the jury may have concluded that, if appellant and others had remained in the house, they were in no real or apparent danger, and that the facts were not such as to make out a case of self-defense, or defense of another; but, notwithstanding this, they might have acquitted him if the court had given the proper instruction on the defense of the home. In view of these circumstances we conclude that the failure to give such instruction was prejudicial error.

On another trial the court will, in addition to the self-defense instruction, instruct the jury as follows:

"If you believe from the evidence that before the defendant fired at the Le Fevers the deceased, or the other Le Fevers acting in concert with him, fired into the home of Hannah Hendrickson for the

purpose of inflicting great bodily harm on defendant, or some other inmate of the house, or that the defendant believed and had reasonable grounds to believe that the deceased, or the other Le Fevers acting in concert with him, were about to fire into the home for such purpose, then the defendant had the right to use such force as reasonably appeared to him to be necessary to repel the assault and avoid the danger, even to the extent of killing them, and if you believe from the evidence that he shot and killed the deceased under these circumstances, and in doing so used no more force than reasonably appeared to him to be necessary to repel the assault and avoid the danger, you will find the defendant not guilty.''

Judgment reversed, and cause remanded for a new trial consistent with this opinion.