## BIRCHAM v. COMMONWEALTH.

Court of Appeals of Kentucky.

Feb. 6, 1951.

Rehearing Denied May 17, 1951.

Rodes K. Myers, Leland H. Logan, Bowling Green, and Robert Zollinger, Louisville, for appellant.

A. E. Funk, Atty. Gen., John B. Browning, Asst. Atty. Gen., for appellee.

VAN SANT, Commissioner.

Appellant and his wife, in a Packard automobile, were passing through a small city (not otherwise identified) a few miles south of Louisville on the evening of August 14, 1949. Appellant was fleeing from the state of Kansas to avoid confinement after conviction for the crime of robbery. His wife was fleeing from the state of Alabama to avoid prosecution in the United States Courts for harboring her husband. They knew that agents of the Federal Bureau of Investigation were looking for them, if not in actual pursuit. They had intended to stop at the home of a friend in

the small city, but drove on when they observed a black Ford which they thought was occupied by agents of the Federal Bureau of Investigation. They arrived in Louisville at about 9:00 o'clock p. m. laboring under the apprehension that peace officers of that city and of the government had been alerted to their expected visit. In their excitement, they turned north on First Street, failing to observe that it was zoned and marked for southbound traffic only. City patrolmen John Tennyson and John A. Ross, in a police cruiser, overtook them and ordered them to pull to the curb. Thinking they were about to be arrested as fugitives of justice, they rapidly drove on to avoid capture. The officers gave chase, firing five shots either at them or into the air. The race ended when the pursued driver lost control of his car and hit a telephone pole. Still thinking he was facing arrest as a fugitive, appellant fled on foot carrying a revolver in each hand. The officers attempted to pocket him behind a house: Tennyson proceeding to the rear and Ross to the front. Bircham ran from behind the house into a driveway between the house and the adjacent property. Tennyson and Ross cross-fired at him, one bullet nicking him in the ear. Bircham fired his revolvers several times after that, but didn't know whether he struck the officers or not. The above statement of facts was testified to by appellant at the trial.

Ross related the same sequence of events with few exceptions, which we now will notice. He testified that when he and Tennyson drove alongside the Packard, they recognized Bircham as a fugitive from justice wanted by the Federal Bureau of Investigation, from his picture appearing on a poster reposing on the bulletin board at Police Headquarters. They then announced to Bircham that he was under arrest, immediately following which Bircham drove on at high speed. Ross further contradicted Bircham by testifying that while he (Ross) was in front of the house he heard several shots being fired in the rear, two of which struck, and one of which killed, Tennyson. He said that between the first and second houses he came face to face with Bircham who rounded the front of the second house and ran between it and a third house. Ross followed. When Bircham again came into view he raised his hands and announced "I give up"; but he immediately started shooting, inflicting six wounds in Ross's body. Ross then fired the single cartridge left in his revolver, after which he threw his revolver at Bircham. Ross further testified that previous to Tennyson's death, all shots fired by the police were directed into the air, but we think this not to be material.

After Ross was wounded, Bircham continued his flight, finally arriving, and tripping over a fence, in the yard of Luther Williams, whose attention had been aroused by the barking of a neighbor's dog. Williams approached Bircham to determine the trouble whereupon the latter pointed both weapons at Williams's face and demanded the keys to his car, simultaneously squeezing the triggers of both his revolvers. The weapons failed to fire, whereupon Bircham ordered Williams into the house following him with the guns to his back. Bircham again pulled the triggers and the revolvers again misfired. Williams then turned, took hold of the revolvers by their barrels, shoved Bircham down the steps, grappled with, captured, and held him until help arrived. The prisoner was then placed in the custody of officers who took him to Police Headquarters. He was later indicted, tried, convicted, and sentenced to death in the electric chair for the murder of Tennyson. We will discuss other evidence introduced at the trial as it becomes necessary to the disposition of the various grounds assigned by appellant for reversal of the judgment.

The homicide occurred on the 14th day of August, 1949, and an indictment charging appellant with the murder of Tennyson was returned by a specially convened grand jury on the 29th day of August. Appellant was arraigned on that indictment, demurred thereto, filed motion to set it aside, and entered a plea of not guilty. The demurrer and motion to set aside the indictment were overruled and the case was assigned to September 29, 1949 for trial.

Appellant then moved the court for a change of venue.

In the meantime, to-wit; on or before September 20, the regular grand jury impaneled for the September Term of court returned another indictment charging appellant with the murder of Tennyson. Appellant was arraigned on this indictment, demurred thereto, filed a motion to set it aside, again moved for a change of venue, and entered a plea of not guilty. The demurrer and motion to set aside the indictment were overruled forthwith; the motion for change of venue was overruled, upon condition it again would be considered if examination of the jury panel developed cause therefor. On call of the case on September 29, it was reassigned to October 11, 1949 for trial.

Appellant insists the court erred in overruling his motion to set aside the indictment because (1) no emergency existed to justify the court in vacation to impanel a special grand jury, and (2) no competent testimony or evidence was heard or viewed by either grand jury.

Since appellant was not tried on the indictment returned by the special grand jury, the first complaint may not be entertained. The second indictment shows on its face that all material witnesses, except experts introduced by the Commonwealth at the trial, were witnesses before the grand jury which returned the indictment pursuant to which appellant was tried. Irrespective of any rule which may obtain in other jurisdictions, our rule of long standing prevails in a majority of states, and is: Section 107 of the Criminal Code of Practice, providing that the grand jury can receive none but legal evidence, is directed to the grand jury and not to the courts, for which reason the court will not inquire into the legality or sufficiency of the evidence on which an indictment is based even if it is averred that no legal evidence was produced before the grand jury. McIntire v. Commonwealth, 4 S.W. 1, 26 Ky.Law Rep. 469; Commonwealth v. Minor et al., 89 Ky. 555, 13 S.W. 5, 11 Ky. Law Rep. 775; State v. Chance, 29 N.M. 34, 221 P. 183, 31 A.L.R. 1466, Annotation 1479; Annotation 27 American Jurispru-dence, Indictments & Information, Section 166.

The evidence heard on the motion for a change of venue was conflicting and examination of prospective jurors did not establish that appellant could not obtain a fair trial in Jefferson County. The trial court has wide discretion in determining whether a motion for a change of venue should be sustained or overruled, and we have never been disposed to declare that he has abused this discretion merely because of a conflict of opinions among witnesses introduced on the motion.

Appellant complains of the conduct of the Commonwealth's Attorney in his voir dire examination of the jury. The Commonwealth's Attorney made frequent and continuous statements to individuals he examined in the presence of other prospective jurors to the effect that the Commonwealth would not be satisfied with any verdict which did not inflict the death penalty. He likewise told them that, irrespective of what they had heard and said previously, they were qualified to sit as jurors if they could decide the case solely on the sworn testimony introduced at the trial. He additionally told them on their examination that there would be no doubt in their minds about the guilt of the accused.

In his opening statement as well as in his closing argument, every statement complained of was available to the Commonwealth's Attorney. He made no misstatement either of law or fact and, although he should have waited until the trial commenced to tell the jury that there would be no doubt in their minds that the defendant was guilty, we believe that his earlier statement to this effect could not have had the effect of operating to appellant's prejudice in this case. We are assured of this fact because as we hereinafter will point out, appellant's own testimony was sufficient to convict him of murder and was insufficient to establish any justification whatever for the crime.

Appellant contends that the judgment should be reversed because of error on the part of the court in permitting the

Commonwealth, on cross-examination of appellant, to prove that he had been convicted of bank robbery in the state of Tennessee in the year 1931, under the alias of John Wallace; that he was convicted of first degree robbery in Kansas in the year 1941; and that he had used fictitious names from time to time in various sections of the country. It is contended that, since the testimony anent the convictions in Kansas and Tennessee concerned other crimes and had no connection with the crime for which appellant was being tried, it was incompetent and highly prejudicial. The evidence was competent, under the admonition which was given by the court that it could be considered only for the purpose of affecting defendant's credibility as a witness, if it did so. Section 597 of the Civil Code of Practice provides that it may be shown by examination of a witness that he has been convicted of a felony. Since appellant offered himself as a witness, it was competent for the Commonwealth under this provision of the Code to prove the conviction by him. Bowman v. Commonwealth, 276 Ky. 745, 125 S.W.2d 213, and cases therein cited. In Hannah v. Commonwealth, 220 Ky. 368, 295 S.W. 159, it was held that it was permissible for the Commonwealth's Attorney on cross-examination to show that a defendant who offered himself as a witness had been convicted of a felony, and to require him to disclose the length of the term of his punishment, since the record of the judgment, if produced, would disclose the same fact. In Bates v. Commonwealth, 260 Ky. 551, 86 S.W.2d 322 and Quillen v. Commonwealth, 275 Ky. 158, 120 S.W.2d 1047, the court held that, for the purpose of affecting his credibility as a witness, it was competent for the Commonwealth to show the nature of the particular felony of which he was convicted. The cases relied on by appellant are not in point. In Hickey v. Commonwealth, 185 Ky. 570, 215 S.W. 431, the Commonwealth attempted to interrogate witnesses other than the defendant concerning a crime of which the defendant had not been convicted. Obviously such testimony is not within the purview of Section 597 of the Civil Code of Practice.

In Bullington v. Commonwealth, 193 Ky. 529, 236 S.W. 961, a witness other than the defendant was permitted to testify that on two occasions he had purchased whiskey at the defendant's restaurant and for neither of which offenses was defendant on trial. This evidence was held to be incompetent because it did not show a conviction of a felony, within the purview of Section 597. In Powell v. Commonwealth, 308 Ky. 467, 214 S.W.2d 1002, the evidence objected to was to the effect that the defendant on trial was a deserter from the United States Army. The Commonwealth did not attempt to prove that he had been convicted of deserting the Army and even if it had, we since have held that desertion from the Army is not a felony within the purview of our Code. Blackburn v. Commonwealth, 314 Ky. 22, 234 S.W.2d 178. In Grigsby v. Commonwealth, 299 Ky. 721, 187 S.W.2d 259, 159 A.L.R. 196, the evidence complained of was to the effect that the defendant merely had been charged with the crime of desertion from the Army. It was held there, as in the Powell case, that it was not competent to show that the defendant had been charged with a particular crime although it was conceded in the opinion that proof of conviction of a felony was competent to impeach a witness in a criminal case. In Marcum v. Commonwealth, 254 Ky. 120, 71 S.W.2d 17, the court did not hold, as syllabus No. 4 recites, that "Commission of offenses other than the one charged should be proved by witnesses and not by cross-examination of defendant". That was a contention of the appellant which was rejected by the court. In Lissenbee v. Commonwealth, 198 Ky. 639, 249 S.W. 782, the court merely held that the character of the defendant could not be attacked until it was placed in issue by defendant himself; and if such were done by introducing himself as a witness, the evidence would be admissible to affect his credibility. In Butler v. Commonwealth, 284 Ky. 276, 144 S.W.2d 510, the questions were not concerning convictions of felonies but merely charges without convictions.

■ Evidence concerning appellant's use of fictitious names throughout the country

was adduced on the Commonwealth's cross-examination of the appellant himself. Appellant contends that this evidence was incompetent. We have held in Hayden v. Commonwealth, 140 Ky. 634, 131 S.W. 521, and Miller v. Commonwealth, 241 Ky. 818, 45 S.W.2d 461, a witness (in the Hayden case the defendant himself) may be asked upon cross-examination any question testing his credibility as a witness; and in Poore v. Commonwealth, 249 Ky. 665, 61 S.W.2d 320, the court observed that considerable latitude is allowed in the examination of witnesses for the purpose of testing their credibility. We have found no previous case in this jurisdiction in which evidence of the use of aliases has been discussed; and in this case we find it unnecessary to determine its competency. However, such evidence has been upheld for the purpose of affecting the credibility of witnesses in Louisiana, North Dakota, South Dakota, Utah, and Arizona. State v. Waldron, 128 La. 559, 54 So. 1009, 34 L.R.A., N.S. 809; State v. Ekanger, 8 N.D. 559, 80 N.W. 482; State v. Sysinger, 25 S.D. 110, 125 N.W. 879, Ann.Cas.1912B, 997; People v. Larsen, 10 Utah 143, 37 P. 258; Fletcher v. State, 40 Ariz. 388, 12 P.2d 284. There would be some foundation for an argument that such evidence is competent to show flight. If not competent for that or any other reason, we think it to have been innocuous, therefore not prejudicial, in view of the competent evidence of the much more violent and heinous conduct of appellant in the past.

■ On cross-examination appellant was asked the name of his friend who resided in the city south of Louisville. He replied that he would rather not "make the statement". He was then asked "Why don't you want to make a statement, is he a police character?" Over objection of appellant he answered: "No sir." In Glisper v. Commonwealth, 186 Ky. 276, 217 S.W. 348; Hendrickson v. Commonwealth, 232 Ky. 691, 24 S.W.2d 564; Stahl v. Commonwealth, 244 Ky. 356, 50 S.W.2d 952, it was held that where a witness answers an incompetent question in the negative the error is not prejudicial, whereas it might be if he answers in the affirmative. The question "You knew you were wanted on a felony; you knew that?" was competent to prove motive for flight. The question "Didn't you shoot it out with the police officers in Toledo, Ohio?" was in response to appellant's testimony on direct examination that his battle with officers Tennyson and Ross was the first time he had ever encountered a "thing of that kind". It certainly was competent for the officers to question him concerning another shooting affray with police officers to contradict the statement given by him on direct examination. An objection was sustained to the question "Have you ever worked a day in your life?" Sustaining the objection protected the appellant if his answer thereto would have been unfavorable to him, but from the statements contained in his brief it seems that the answer would have been extremely favorable to him if he had not objected; so from either aspect we cannot perceive that he was prejudiced. The evidence of Williams concerning the events resulting in Bircham's capture was competent as part of the res gestae, Warner v. Commonwealth, 255 Ky. 361, 74 S.W.2d 201, and to show guilty knowledge of the crime for which he was on trial.

■ Throughout his argument appellant contends that the Commonwealth failed to show that the fatal bullet was fired by appellant, and, in this connection, attacks the integrity of the bullet introduced as exhibit No. 31, upon which the Commonwealth relies in support of its argument to the contrary. We cannot agree with appellant's contention. The Commonwealth introduced Doctor Gohman, resident surgeon in pathology at the Louisville General Hospital, who testified that he performed an autopsy on the body of Tennyson; he found two wounds in the chest which were the points of entry of separate bullets; one of the bullets was deflected by the breast bone and made its exit midway down the right side of the back; the other caused the death of decedent, passing through the heart and lodging in the right lung. The first bullet was found in the clothes of the deceased and the second was removed from the body. The autopsy was performed in the presence of officer Robert Berry, of the

Louisville Police Department, and a colored helper. Both bullets were washed and placed in the custody of Berry who retained their possession until they were initialed by him and the doctor some forty-five minutes later; the fatal bullet differed from the other bullet in that it had a "crease" or "nick" on its nose indicating that it had met with some obstruction before entering the body. The doctor identified this bullet (exhibit No. 31) as the one which had passed through the heart and was removed from the lung of the deceased. He identified the second bullet as being the one which was found in the clothing of the deceased and which was marked and filed as exhibit No. 32. He stated that the bullets were in the same condition as when delivered to officer Berry. Officer Berry testified that he was present at the autopsy for the purpose of receiving and preserving the bullets for later identification. He stated that the one removed from the right lung was fired from a .38 caliber revolver and that a "corrugated mark" on its nose distinguished it from the bullet found in the clothes of the deceased. He identified exhibit No. 31 as the bullet removed from the right lung. He stated that when he received the bullets at the hands of Doctor Gohman, he immediately placed them in an envelope where he kept them on his person until they were initialed by him and the doctor. He then placed the bullets in separately marked boxes and delivered them to the Chief of Police and two agents of the Federal Bureau of Investigation. Colonel Carl Heustis, Chief of the Louisville Police Department, testified that, under the supervision and in the presence of two agents of the Federal Bureau of Investigation, he placed exhibits No. 31 and No. 32 in a box, together with the weapons taken from Bircham and other items, and expressed the box to the laboratories of the Federal Bureau of Investigation at Washington, D. C. He testified that he assisted in the removal of the shirt from the body of Tennyson and found a pair of glasses with metal ear pieces in the left pocket of the shirt. One of the ear pieces had been driven through a note book and into the body of deceased, and the location of the glasses in the shirt indicated that this was done by the bullet which entered the heart. George Berley, a ballistics expert of the Federal Bureau of Investigation, testified that he received the box sent to the laboratories in Washington and, among other things, there were two bullets which he identified as exhibits No. 31 and No. 32. He stated that he conducted tests by firing bullets from both the weapons which had been identified as having been used by Bircham in his battle with the officers. He stated that his tests proved that exhibit No. 31 was fired from the .38 Caliber Colt Police Positive Revolver which was identified as having been fired by Bircham in the battle, and that he observed an indentation on the nose of the bullet, filed as exhibit No. 31, which corresponded with the markings on the ear piece of the glasses which were taken from the pocket of the shirt removed from Tennyson's body. It is apparent that the Commonwealth traced the bullet which caused the death of Tennyson from the time it left the revolver fired by Bircham until it was introduced on the trial.

 There remains for our determination the interesting question of the power of the officers to arrest or attempt to arrest Bircham, and their consequent rights in respect to the force available to them in effecting the arrest. They were not possessed of a warrant of arrest. Article 4, Section 2 of the Constitution of the United States provides for the extradition from one state to another of persons charged with commission of crimes. In obedience to this provision of the Constitution, the Legislature of Kentucky, in the year 1840, passed an Act providing the manner in which an arrest may be made by peace officers of Kentucky to assist other states in vindicating their own laws. The substance of the original Act has remained a part of our statutory law to this hour, and now appears in KRS 440.080. In substance, it provides that any ministerial officer or other person, to whom by name a warrant is sued by any judicial authority may be directed, shall have the authority to arrest a person guilty of the commission of a felony anywhere in the United States, if found in this state. In the year 1856, this

Court held that in no case can a fugitive from justice from another state be arrested in this Commonwealth, except upon the production of an indictment found against him in the state from which he has fled, or upon affidavit that the fugitive is guilty of the crime. Botts and Co. v. Williams, 17 B. Mon. 687, 56 Ky. 546. In that case the arrest was made by private persons without warrant and the suit was for false arrest. The defendants were held to be answerable. In the year 1897, the question again was before the court; the only distinction being that a peace officer made the arrest. The court said: "Kentucky Statutes, Section 1930 (KRS–440.080), authorizes arrest and confinement in jail, and delivery over to the proper authority, of a person guilty of a felony anywhere in the United States, if found in this state, only when a warrant has been issued by judicial authority upon affidavit of the facts." Glazar v. Hubbard, 102 Ky. 68, 42 S.W. 1114, 39 L.R.A. 210. Connecticut has a similar statute (Gen.St.1930, Sections 6545–6558). In construing their statute, the Connecticut Supreme Court of Errors said: " * * * having committed no offense in this state, and as the only charge was made by the detectives (who made the arrest) and related to some offense committed in another state, the officers could only obtain authority to arrest him (the defendant) as a fugitive from justice by proceeding under our statutory provisions governing the arrest and extradition of such fugitives." State v. Engle, 115 Conn. 638, 162 A. 922, 924. The opinion in that case was rendered in the year 1932. Thus this Court's construction of our statute was fortified by a similar construction of an almost identical statute by the highest court of Connecticut. So, under our laws in force previous to the year 1934, a fugitive from justice of another state could not be arrested in this state, except under the authority of a warrant directed to the person attempting the arrest. In considering the provisions of KRS 440.080 and the decisions construing it previous to the year 1934, we must not lose sight of the fact that in each case wherein the statute was construed, the crime for which the person was arrested was one which had not been committed in this state or in the presence of the person attempting to make the arrest; and we must bear in mind that, at the time of the rendition of the decisions we have referred to, a peace officer was, and now is, clothed with authority to arrest, without warrant, any person who commits a felony, or even a misdemeanor, in this state in the presence of the officer making the arrest.

 As modern means of conveyance and improved highways increased facilities of escape to the point that a criminal could flee to a jurisdiction of safety scarcely before the commission of a crime was discovered, it became apparent to law enforcement officers and finally to the Congress of the United States that the barrier presented by state boundaries should be removed. Accordingly, the Congress, in the year 1934, enacted a law which now is compiled under Title 18 U.S.C.A. § 1073 (formerly § 408e) which, insofar as pertinent to our question, reads: " * * * Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for murder, kidnaping, burglary, robbery, mayhem, rape, assault with a dangerous weapon, or extortion accompanied by threats of violence, or attempt to commit any of the foregoing offenses as they are defined either at common law or by the laws of the place from which the fugitive flees, * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both." This Act was held to be constitutional in Hemans v. United States, 6 Cir., 163 F.2d 228; certiorari denied 332 U.S. 801, 68 S. Ct. 100, 92 L.Ed. 380; rehearing denied 332 U.S. 821, 68 S.Ct. 152, 92 L.Ed. 397. Since the passage of this Act, any person moving or traveling in interstate commerce with intent to avoid confinement after conviction for robbery under the laws of the place from which he flees, is guilty of committing a felony whenever and wherever apprehended. Such flight is a separate and distinct offense from the crime of that for

which the fugitive was convicted in the foreign jurisdiction, and is an offense against the laws of the United States. In United States v. Bumbola et al., D.C.N.Y., 23 F.2d 696, the court held that it is the duty of a peace officer of a state to arrest without a warrant any person committing an offense against the laws of the United States in his presence. Thus it will be seen that appellant, for quite a while previous to, and at the time of, his apprehension on First Street, and continuously thereafter, was in overt action in the commission of a felony in the presence of the officers attempting to take him in custody. It not only was their right, it was their duty, to arrest him, and, attendant upon such right and duty, they had the legal right to use such force as was necessary to prevent appellant's escape, even to killing him. Johnson v. Cheseapeake & O. Ry. Co., 259 Ky. 789, 83 S.W.2d 521. Appellant's own testimony shows that as long as he had ammunition, he would not submit, unless shot or killed. It follows that he had no right, or semblance of right, to resist arrest or to flee in an attempt to escape therefrom. Appellant testified on the witness stand that he knew the official character of the officers attempting to arrest him. We have held in many cases that the killing of an officer by one resisting him, when the officer is in the proper discharge of his duty to preserve the peace, is murder, if the slayer knows the official character of the officer. Cornett v. Commonwealth, 198 Ky. 236, 248 S.W. 540.

Since appellant's own testimony convicted him of the murder of Tennyson, only such errors as may be calculated to have inflamed the minds of the jurors to the extent of causing them to inflict the extreme penalty in preference to life imprisonment, could be deemed to have been prejudicial to appellant's substantial rights. We have found no such error in this record.

The judgment is affirmed.

MOREMEN, J., not sitting.