W. L. (Levy) RICE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

W. L. (Levy) RICE, Appellant,

v.

Porter B. LADY, Warden, Appellee.

Court of Appeals of Kentucky.

March 23, 1956.

Tackett & Tackett, Prestonsburg, George F. Williamson, LaGrange, for appellant.

J. D. Buckman, Jr., Atty. Gen., W. Owen Keller, Zeb A. Stewart, Asst. Attys. Gen., for appellees.

MOREMEN, Judge.

The appellant, W. L. (Levy) Rice, killed Reedy Whicker with a sawed-off shotgun. He was indicted for murder, convicted of voluntary manslaughter, and sentenced to confinement in the penitentiary for 21 years. The indictment was returned in Floyd County and the case was tried in Lawrence County.

Reedy Whicker was adjudged insane on December 9, 1954, and was confined to the jail in Prestonsburg until the date set for his removal to a state mental hospital on December 11, 1954, on which date, V. A. Hayes, a son of the jailer, Blackburn, a deputy sheriff, and Click, a deputy jailer, undertook to transport him to the mental institution. After the men prepared Blackburn's car for the trip, they convened at the court room where Whicker was quietly sitting. Hayes informed him that it would be necessary to put handcuffs on him. Whicker objected to this and became disturbed, and Hayes left to summon help. Blackburn came to his assistance and while

helping Hayes to quiet Whicker, he, Blackburn, took hold of his arm and Whicker immediately started striking at Blackburn.

We will not delineate each scuffle that took place before the fatal one, but there were several. Hayes testified that the last one was like this:

"Ray Click was on the right hand side of Mr. Whicker and I was on the left hand side, going down, and I noticed Frank Blackburn had a rope in his hands and I dropped back to see what Mr. Blackburn was going to do with that rope and I noticed he was tying a knot in the rope, making a loop, and he was getting ready to throw the loop over his shoulders and I kept back far enough to see when he got ready to throw the loop over Mr. Whicker's shoulders, and when he got ready, we were almost in front, I would say, or very near the front of that little Dairy Bar building when he made an attempt to put that rope over Reedy Whicker's head and shoulders, but he was a little slow in getting the loop drawn up and Reedy's left hand came out first and I grabbed his wrist and he slung me off to the side and he got his other hand loose and he started striking at Mr. Blackburn and that was the first time I noticed Levy Rice's car parked there and Frank Blackburn bumped into it and when he got straightened up he came around by the side of Levy's car and Mr. Whicker struck at him three or four times and he passed up Levy's car eight or ten feet and in the meantime Mr. Blackburn got out of the way, and when Mr. Whicker stopped striking at Frank Blackburn, he turned and started back up the highway the way we had come."

Hayes then stated that when Whicker started back up the highway, he came within about two feet of the back of Levy Rice's car. Rice raised the sawed-off shotgun to his shoulder; Hayes called to him and told him not to shoot, but Rice pointed the gun towards Whicker's face and fired, and,

"After the shot fired, he stood there, it seemed to me, a long time before he finally fell, and when he fell, he fell forward with his feet both together and his hands down

at his sides, and after he fell, his hands were in front of him and the money that we had given him rolled out of his hand into the blood and I wanted to pick it up for a souvenir, but I couldn't get it out of the blood."

Again:

"It mashed his face flat and it looked like an orange that had been peeled and laid open."

Hayes' graphic description of the shooting was corroborated in almost all aspects by a good many witnesses who had been attracted to the scene by the preliminary scuffles when the officers attempted to control the prisoner. In some details it was embellished. John Forsyth, a member of the Department of Mines and Minerals of Kentucky, who had had police training and experience himself, said this: "The deputy sheriff kept aiming that gun and this fellow that was standing there said: 'Don't shoot— don't shoot that man,' and the gun went off and this man in the checkered shirt fell and the man who fired the gun said, 'any son of a bitch that can't be controlled ought to be dead anyway.'"

Levy Rice, who had been deputy sheriff in Floyd County for six or seven years, testified that he did not know Reedy Whicker or that he had been adjudged insane (although there is evidence to the contrary in the record). After relating the instances which led up to Whicker's flight, he testified as follows:

"Q. Did he say anything to you? A. He said, 'Shoot, you G—— D—— son-of-a-bitch, you ain't got the nerve, or I will kill you.'

"Q. What took place then? A. I threw my gun up to my shoulder when he started talking and when he said, 'I will kill you,' I dropped the gun and his left hand hit the barrel of that gun and it went off.

"Q. Did you fire that gun then? A. That is right, I did.

"Q. Why did you shoot? A. To save my own life and others.

"Q. Why do you say, 'others'? A. For I knew there were six (6) shells in that gun and if he had got hold of that gun he would have used it.

"Q. What kind of gun was it, Mr. Rice? A. It was a sawed off shotgun, or pump gun.

"Q. A regular officer's pump gun? A. No, sir, just a sawed off shotgun."

In some respects Rice's evidence was corroborated by other witnesses, particularly in his denial that he had said anything to the effect that a person who cannot be controlled ought to be dead.

The case was submitted to the jury under four instructions: 1. Murder; 2. Voluntary manslaughter; 3. An instruction which sets out that Rice was a deputy sheriff who had the duty to prevent all breaches of public peace, and if Whicker was engaged in boisterous conduct reasonably calculated to disturb the public peace or to endanger the life of appellant, or of others, it was the duty of appellant to use such means as might be necessary to prevent a continuation of such conduct. This instruction further sets out that if Rice knew of or had reasonable grounds for believing that Whicker was an insane person at large, not in the care of some discreet person, then Rice had the duty to arrest or subdue Whicker and use such force as was reasonably necessary; 4. An instruction on whether the firing of the gun by defendant was accidental and unintentional or if it was caused by Whicker striking the shotgun. Other formal instructions were given.

The jury returned the following verdict: "We the jury agree and find the defendant guilty under instruction No. 2, and fix his punishment at 21 years in the state penitentiary without mercy," and while uttering a denial of mercy, they granted it. The evidence could well have sustained a verdict under instruction No. 1.

After appellant had been committed to the penitentiary at LaGrange, a petition requesting a writ of habeas corpus was filed in the Oldham Circuit Court and, upon denial of the writ by that court, an appeal was taken. An appeal was also taken from the judgment entered by the Lawrence Circuit Court and these appeals, since the issues are common, have been consolidated.

Appellant first contends that the indictment was void and should have been quashed because it was returned in this manner: The commonwealth's attorney took with him to the grand jury of the Floyd Circuit Court an affidavit and warrant which he had obtained from the county judge's office. This affidavit of Melvin H. Goble had been written in longhand by the county judge, acknowledged before him and was the affidavit upon which the warrant had issued. It was the only evidence heard or considered by the grand jury before the indictment was returned.

Appellant argues that the indictment is void because it is nothing more than a prosecution by information, wholly in violation of Section 12 of the Constitution, and KRS 455.080.

Section 12 provides that no person shall be proceeded against criminally by information except in cases arising in the Armed Forces when in actual service in times of war or public danger or by leave of court for oppression or misdemeanor in office. The statute designates those offenses which may be prosecuted by warrant or information, and this group excludes felonies.

We think this argument overlooks the distinction between indictment or presentment and information. All three are accusatory in nature but the words are defined and given meaning by reason of their origin. "Indictment" is a technical word, peculiar to Anglo Saxon jurisprudence and implies the finding of a grand jury, as does also the word "presentment." "Information" is a written accusation of a crime, preferred by a public prosecuting officer without the intervention of a grand jury. 27 Am.Jur., Indictments and Information, § 4. Here, if the commonwealth's attorney had taken the affidavit and had attempted, ex officio, to issue the accusation, it would, in fact, have been an information, but when

a grand jury issues an accusatory writ, it is, in fact, an indictment, however defective it may be.

Appellant points out that Section 107 of the Criminal Code of Practice provides that the grand jury can receive none but legal evidence, but faces up to the fact that this court has on several occasions held that the court has no power to go behind an indictment for the purpose of inquiring into the competency of the evidence before the grand jury. The opinion that best summarizes the attitude of the court may be found in Bircham v. Commonwealth, Ky., 238 S.W.2d 1008, 1011, where it is said:

"Section 107 of the Criminal Code of Practice, providing that the grand jury can receive none but legal evidence, is directed to the grand jury and not to the courts, for which reason the court will not inquire into the legality or sufficiency of the evidence on which an indictment is based even if it is averred that no legal evidence was produced before the grand jury. McIntire v. Commonwealth, 4 S.W. 1, 26 Ky.Law. Rep. 469; Commonwealth v. Minor, 89 Ky. 555, 13 S.W. 5, 11 Ky.Law Rep. 775; State v. Chance, 29 N.M. 34, 221 P. 183, 31 A.L.R. 1466, Annotation 1479; Annotation 27 American Jurisprudence, Indictments & Information, Section 166."

Appellant argues, however, on authority from other state and federal jurisdictions, that the rule is not a sound one and requests that we reconsider and change it. While we agree that the courts of this country are not in accord on this question, we think the trend of the decisions is in the course adopted so long ago by this court.

In the latest case we have been able to find, Costello v. United States, 76 S.Ct. 406, 408, the court, after pointing out that our grand jury system is founded on the English institution, said this:

"The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or indictments on such information as they deemed satisfactory. Despite its broad power to institute criminal proceedings the grand jury grew in popular favor with the years. It acquired an independence in England free from control by the Crown or judges. Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice. And in this country as in England of old the grand jury has convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor."

And further:

"Petitioner urges that this Court should exercise its power to supervise the administration of justice in federal courts and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict."

We are not, therefore, disposed to change our rule.

■ Appellant next contends that the verdict was not supported by the law and the evidence. We have set forth first above in this opinion a portion of the evidence introduced by the Commonwealth which in itself we believe is enough to support the verdict.

■ Appellant finally contends that under instruction No. 3, which we noted at some length above, the jury had no al-

ternative other than to return a verdict of not guilty under the facts presented. This instruction was much more favorable to the defendant than he was entitled to receive because, as pointed out in Roberson's New Kentucky Criminal Law and Procedure, Sec. 285, and cases cited thereunder, an officer is never justified in killing merely to effect an arrest or prevent an escape after arrest when the offense is a misdemeanor. In any event, the officer must use no greater force than is necessary, or apparently so, for his protection, or to prevent the prisoner, if in custody, from effecting his escape by overpowering the officer by force or violence.

In the case at bar the jury evidently believed the officer used unnecessary force— and so do we.

For the reasons given, the judgment is affirmed in both cases.